35 U.S. 103 (____)
10 Pet. 103
*NELSON J. ELLIOTT
v.
SAMUEL SWARTWOUT.
Supreme Court of United States.

*104 The case was argued by Mr. Ogden for the plaintiff, and by Mr. Butler, attorney-general, for the defendant.
The attorney-general, Mr. Butler, for the defendant.
*112 *150] *Mr. Justice THOMPSON delivered the opinion of the court.
This is an action of assumpsit to recover from the defendant the sum of three thousand one hundred dollars and seventy-eight cents, received by him for duties as collector of the port of New York, on an importation of worsted shawls with cotton borders, and worsted suspenders with cotton straps or ends. The duty was levied at the rate of 50 per centum ad valorem, under the second article of the second section of the act of the 14th of July, 1832, entitled "An act to alter and amend the several acts imposing duties on imports," as manufactures of wool, or of which wool was a component part. Upon the trial of the cause, it appeared that the shawls imported, and upon which the duty of 50 per centum ad valorem had been received, were worsted shawls with cotton borders sewed on; and that the suspenders were worsted with cotton ends or straps. And it appeared in evidence, that worsted was made out of wool, by combing, and thereby become a distinct article, well known in commerce under the denomination of worsted, and upon the trial, the judges were divided in opinion upon the following questions:
1. Whether the said shawls and suspenders were or were not a manufacture of wool, or of which wool was a component part, within the meaning of the words "all other manufactures of wool, or of *113 which wool is a component part," in the second article of the second section of the act of congress of the 14th of July, in the year 1832.
2. Whether the collector is personally liable in an action to recover back an excess of duties paid to him as collector, and by him in the regular or ordinary course of his duty paid into the treasury of the United States; he, the collector, acting in good faith, and under instructions from the treasury department; and no protest being made at the time of payment, or notice not to pay the money over, or intention to sue to recover back the amount given him.
3. Whether the collector is personally liable in an action to recover back an excess of duties paid to him as collector, and by him paid over in the regular and ordinary course of his duty into the treasury of the United States; he, the collector, acting in good faith, and under instructions from the treasury department, a *notice [*151 having been given him at the time of payment, that the duties were charged too high, and that the party paying, so paid to get possession of his goods, and intended to sue, to recover back the amount erroneously paid, and a notice not to pay over the amount into the treasury.
1. The act of 1832, in the section under which this question arises, after imposing a specific duty on a number of enumerated articles, concludes in these words: "and upon merino shawls made of wool, all other manufactures of wool, or of which wool is a component part, and on ready-made clothing, 50 per centum ad valorem." And the only question under this point is, whether worsted shawls with cotton borders, and worsted suspenders with cotton ends or straps, are manufactures of wool, or of which wool is a component part. It is stated in the point, as a fact, and to be taken in connexion with the question, that worsted is made out of wool by combing; but that it becomes thereby a distinct article, well known in commerce under the denomination of worsted.
Laws imposing duties on importations of goods, are intended for practical use and application by men engaged in commerce; and hence it has become a settled rule in the interpretation of statutes of this description, to construe the language adopted by the legislature, and particularly in the denomination of articles, according to the commercial understanding of the terms used. This rule is fully recognized and established by this court, in the case of two hundred chests of tea, reported in 9 Wheat. 438. The court there say, the object of the duty laws is to raise revenue, and for this purpose to class substances according to the general usage and known denominations of trade. Whether a particular article was designated by one name or another, in the country of its origin; or whether it were a simple or mixed substance; was of no importance in the view of the legislature. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic; and it would have been as dangerous as useless, to attempt any other classification than that derived from the actual *114 business of human life. It being admitted, in this case, that worsted *152] is a distinct article, well known in commerce under *that denomination, we must understand congress as using the term in that commercial sense, and as contradistinguished from wool, and woollen goods, and other well-known denomination of goods. The classification of the article in this section, shows that congress had in view a class of goods known as worsted goods, as contradistinguished from wool, and upon which a different duty is laid. A duty of ten per centum ad valorem is laid on worsted stuff goods, shawls, and other manufactures of silk and worsted, and on worsted yarn, twenty per centum ad valorem. If, because worsted is made of wool, all manufactures of worsted become woollen manufactures, there would be no propriety in enumerating worsted goods as a distinct class.
Suppose the shawls, in this case, had been without borders; they would then have been entirely composed of worsted. It could not, certainly, in such case, be pretended that they were manufactures of wool, if there is any distinction between worsted and wool. Nor would they be a manufacture of which wool is a component part. Such manufactures are, where the article is composed of different materials compounded; but these shawls, without the borders, would be entirely worsted, and no compound of different materials. And if the shawls, without the borders, would be worsted, and not woollen goods, the addition of a cotton border would not make them woollen. If the border had been wool instead of cotton, it might with some propriety be said, that wool was a component part. But adding cotton to worsted, cannot with any propriety be said to make the article woollen. The same remarks may be applied to the suspenders; adding cotton ends or straps to worsted suspenders, cannot make them woollen goods.
This view of the case, would be an answer to the question as put in the point. The court is not called upon to say what is the duty imposed by the law upon these articles, but only to say whether they are subject to a duty of fifty per centum ad valorem, as manufactures of wool, or of which wool is a component part. But as this question may arise upon the trial, it is proper for the court to express an opinion upon it. The question is certainly, as it respects the suspenders, not free from difficulty. The language of the act is obscure, and not susceptible *153] of an *interpretation entirely satisfactory. There is no part of this section that will cover the goods in question, except that which imposes a duty of ten per centum ad valorem on worsted stuff goods, shawls, and other manufactures of silk and worsted. This duty is imposed upon shawls of some description, and none but worsted, would at all answer the denomination. Merino shawls, made of wool, are specifically enumerated and made subject to a duty of fifty per centum. The clause imposing the duty on worsteds may well admit of reading "worsted stuff goods and worsted shawls;" they are certainly not a manufacture of worsted and silk. It might be a proper subject of inquiry upon the trial, whether shawls of this description are usually denominated worsted shawls in the *115 market, and if so, the rule of construction alluded to, would apply to the case. At all events, the answer to be given to the question as put, must be, that the shawls and suspenders are not a manufacture of wool, or of which wool is a component part.
2. The case put in the second point, is whether the collector has received the money in the ordinary and regular course of his duty, and has paid it over into the treasury, and no objection made at the time of payment, or at any time before the money was paid over to the United States. The manner in which the question is here put, presents the case of a purely voluntary payment, without objection or notice not to pay over the money, or any declaration made to the collector of an intention to prosecute him to recover back the money. It is therefore to be considered as a voluntary payment, by mutual mistake of law; and in such case, no action will lie to recover back the money. The construction of the law is open to both parties, and each presumed to know it. Any instructions from the treasury department could not change the law, or affect the rights of the plaintiff. He was not bound to take, and adopt that construction. He was at liberty to judge for himself, and act accordingly. These instructions from the treasury seem to be thrown into the question for the purpose of showing, beyond all doubt, that the collector acted in good faith. To make the collector answerable, after he paid over the money, without any intimation having been given that the duty was not legally charged, cannot be sustained *upon any sound principles [*154 of policy or law. There can be no hardship in requiring the party to give notice to the collector that he considers the duty claimed illegal, and put him on his guard, by requiring him not to pay over the money. The collector would then be placed in a situation to claim indemnity from the government. But if the party is entirely silent, and no intimation of an intention to seek a repayment of the money; there can be no ground upon which the collector can retain the money, or call upon the government to indemnify him against a suit. It is no sufficient answer to this that the party cannot sue the United States. The case put in the question, is one where no suit would lie at all. It is the case of a voluntary payment under a mistake of law, and the money paid over into the treasury: and if any redress is to be had, it must be by application to the favour of the government, and not on the ground of a legal right.
The case of Morgan v. Palmer, 2 Barn. and Cres. 729, was an action for money had and received, to recover back money paid for a certain license; and one objection to sustaining the action was, that it was a voluntary payment. The court did not consider it a voluntary payment, and sustained the action: but Chief Justice Abbot, and the whole court, admitted that the objection would have been fatal, if well-founded in point of fact. The court said it had been well argued, that the payment having been voluntary, it could not be recovered back in an action for money had and received. And in Brisbain v. Dacres, 5 Taunt. 154, the question is very fully examined by Gibbs, justice, and most of the cases noticed and commented *116 upon, and with the concurrence of the whole court, except Chambre, justice, lays down the doctrine broadly, that where a man demands money of another, as matter of right, and that other, with a full knowledge of the facts upon which the demand is founded, has paid a sum of money voluntarily, he cannot recover it back. It may be, says the judge, that, upon a further view, he may form a different opinion of the law; and it may be, his subsequent opinion may be the correct one. If we were to hold otherwise, many inconveniences may arise. There are many doubtful questions of law. When they arise, the defendant has an option either to litigate the question, or *155] submit to the demand and pay the money. But *it would be most mischievous and unjust, if he, who has acquiesced in the right by such voluntary payment, should be at liberty, at any time within the statute of limitations, to rip up the matter and recover back the money. This doctrine is peculiarly applicable to a case where the money has been paid over to the public treasury, as in the question now under consideration, Lord Eldon, in the case of Bromley v. Holland, 7 Vesey, 23, approves the doctrine, and says it is a sound principle, that a voluntary payment is not recoverable back. In Cox v. Prentice, 3 Maul and Selw. 348, Lord Ellenborough says: I take it to be clear, that an agent who receives money for his principal, is liable, as a principal, so long as he stands in his original situation, and until there has been a change of circumstances, by his having paid over the money to his principal, or done something equivalent to it. And in Buller v. Harrison, 2 Cowp. 568, Lord Mansfield says, the law is clear, that if an agent pay over money, which has been paid to him by mistake, he does no wrong, and the plaintiff must call on the principal; that if, after the payment has been made, and before the money has been paid over, the mistake is corrected, the agent cannot afterwards pay it over without making himself personally liable. Here, then, is the true distinction: when the money is paid voluntarily, and by mistake to the agent, and he has paid it over to the principal, he cannot be made personally responsible; but if, before paying it over, he is apprized of the mistake, and required not to pay it over, he is personally liable. The principle laid down by Lord Ellenborough, in Townsend v. Wilson, 1 Campbell, 396, cited and relied upon on the part of the plaintiff, does not apply to this case. He says, if a person gets money into his hands illegally, he cannot discharge himself by paying it over to another: but the payment, in that case, was not voluntary: for, says Lord Ellenborough, the plaintiff had been arrested, and was under duress when he paid the money. In Stevenson v. Mortimer, 2 Cowp. 816, Lord Mansfield lays down the general principle, that if money is paid to a known agent, and an action is brought against the agent for the money, it is an answer to such action that he has paid it over to his principal. That he intended, however, to apply this rule to cases of [*156 voluntary payments made by *mistake, is evident from what fell from him in Sadler v. Evans, 4 Bur. 1987. He there said, he kept clear of all payments to third persons, but where it is to a *117 known agent; in which case the action ought to be brought against the principal, unless in special cases, as under notice, or mala fides: which seems to be an admission that, if notice is given to the agent before the money is paid over, such payment will not exonerate the agent. And this is a sound distinction, and applies to the two questions put in the second and third points in the case now before the court. In the former, the payment over is supposed to be without notice; and in the latter, after notice and a request not to pay over the money. The answer, then to the second question is, that under the facts there stated, the collector is not personally liable.
3. The case put by the third point, is where, at the time of payment, notice is given to the collector that the duties are charged too high, and that the party paying, so paid to get possession of his goods; and accompanied by a declaration to the collector, that he intended to sue him to recover back the amount erroneously paid, and notice given to him not to pay it over to the treasury.
This question must be answered in the affirmative, unless the broad proposition can be maintained, that no action will lie against a collector to recover back an excess of duties paid him; but that recourse must be had to the government for redress. Such a principle would be carrying an exemption to a public officer beyond any protection, sanctioned by any principles of law or sound public policy. The case of Irving v. Wilson and another, (4 Term Rep. 485,) was an action for money had and received, against custom-house officers, to recover back money paid to obtain the release and discharge of goods seized, that were not liable to seizure; and the action was sustained. Lord Kenyon observed, that the revenue laws ought not to be made the means of oppressing the subject; that the seizure was illegal; that the defendants took the money under circumstances which could by no possibility justify them; and, therefore, this could not be called a voluntary payment.
The case of Greenway v. Hurd, (4 Term, 554,) was an action against an excise officer, to recover back duties illegally *received; [*157 and Lord Kenyon does say, that an action for money had and received will not lie against a known agent, but the party must resort to the superior. But this was evidently considered a case of voluntary payment. The plaintiff had once refused to pay, but afterwards paid the money; and this circumstance is expressly referred to by Buller, justice, as fixing the character of the payment. He says, though the plaintiff had once objected to pay the money, he seemed afterwards to waive the objection by paying it. And Lord Kenyon considered the case as falling within the principle of Sadler v. Evans, 4 Bur. 1984, which has already been noticed. In the case of Snowden v. Davis, 1 Taunt. 358, it was decided that an action for money had and received, would lie against a bailiff, to recover back money paid through compulsion, under colour of process, by an excess of authority, although the money had been paid over. The court say, the money was paid to the plaintiff, under the threat of a distress; and although paid over to the sheriff, and by him into *118 the exchequer, the action well lies; the plaintiff paid it under terror of process to redeem his goods, and not with intent, that it should be paid over to any one. The case of Ripley v. Gelston, 9 John. 201, was a suit against a collector to recover back a sum of money demanded by him for the clearance of a vessel. The plaintiff objected to the payment, as being illegal, but paid it for the purpose of obtaining the clearance, and the money had been paid by the collector into the branch bank to the credit of the treasurer. The defence was put on the ground that the money had been paid over, but this was held insufficient. The money, say the court, was demanded as a condition of the clearance; and that being established, the plaintiff is entitled to recover it back, without showing any notice not to pay it over. The cases which exempt an agent do not apply. The money was paid by compulsion. It was extorted as a condition of giving a clearance, and not with intent or purpose to be paid over. In the case of Clinton v. Strong, 9 John. 369, the action was to recover back certain costs, which the marshal had demanded on delivering up a vessel which had been seized, which costs the court considered illegal; and one of the questions was whether the payment was *158] voluntary. The court said the payment, could *not be voluntary. The costs were exacted by the officer, colore officii, as a condition of the redelivery of the property; and that it would lead to the greatest abuse to hold that a payment under such circumstances, was a voluntary payment precluding the party from contesting it afterwards. The case of Hearsey v. Pryn, 7 John. 179, was an action to recover back toll which had been illegally demanded; and Spencer, justice, in delivering the opinion of the court, says the law is well settled, that an action may be sustained against an agent who has received money, to which the principal had no right, if the agent has had notice not to pay it over. And in the case of Fry v. Lockwood, 4 Cowen 456, the court adopts the principle, that when money is paid to an agent for the purpose of being paid over to his principal, and is actually paid over, no suit will lie against the agent to recover it back. But the distinction taken in the case of Ripley v. Gelston, is recognized and adopted; that the cases which exempt an agent when the money is paid over to his principal without notice, do not apply to cases where the money is paid by compulsion, or extorted as a condition, &c. From this view of the cases, it may be assumed as the settled doctrine of the law, that where money is illegally demanded and received by an agent he cannot exonerate himself from personal responsibility by paying it over to his principal; if he has had notice not to pay it over. The answer, therefore, to the third point must be, that the collector is personally liable to an action to recover back an excess of duties paid to him as collector, under the circumstances stated in the point; although he may have paid over the money into the treasury.
This cause came on to be heard on the transcript of the record from the circuit court of the United States, for the southern district of *119 New York, and on the questions on which the judges of the said circuit court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of congress in such case made and provided, and was argued by counsel; on consideration whereof, it is the opinion of this court, on the first question, that the said shawls and suspenders were *not a manufacture of [*159 wool, or of which wool is a component part, within the meaning of the words "all other manufactures of wool, or of which wool is a component part," in the second article of the second section of the act of congress of 14th July, 1832.
On the second question, it is the opinion of this court, that, under the facts as stated in the said second question, the collector is not personally liable.
On the third question, it is the opinion of this court that the collector, under the circumstances as stated in the said question, is liable to an action to recover back an excess of duties paid to him as collector, although he may have paid over the money into the treasury. Whereupon, it is ordered and adjudged by this court to be so certified to the said circuit court of the United States for the southern district of New York.