(C. D. 244)

F. W. WOOLWORTH CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 1, 1939)

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is an action against the United States wherein the plaintiff seeks to recover certain sums of money claimed to have been illegally collected and paid upon an importation of china novelties

whereon the collector of customs at the port of New York had assessed a countervailing duty under authority of the finding made by the Secretary of the Treasury as published in T. D. 48479. The merchandise is a product of Germany and was exported from that country under permits granted by governmental agencies which allowed the payment of 90 per centum of the purchase price in a stipulated amount of registered reichsmarks and the balance to be paid in so-called free reichsmarks. Payment was to be made upon exportation of the merchandise in question. No controversy exists concerning the proper dutiable classification made by the collector of the merchandise. The sole question involved is the legality of the countervailing duty assessed.

The Government claims in brief that Germany has adopted certain procedure required to be carried out by the purchaser and exporter which results in the payment or bestowal by Germany of a bounty or grant upon the production and/or exportation of the merchandise in question, and therefore it was required under the provisions of section 303 of the Tariff Act of 1930 that countervailing duty should be assessed.

The plaintiff, the importer of the merchandise, contravenes this claim and alleges that there has been no bounty or grant paid or bestowed upon the manufacture or exportation of the merchandise in question.

Section 303, *supra* (46 Stat. 590, 687; U. S. C., title 19, sec. 1303), provides as follows:

SEC. 303. COUNTERVAILING DUTIES.

Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

The court has had before it the question of assessing countervailing duty on various occasions but in no case have the circumstances which

impelled the collection of such duty been similar to the circumstances involved herein. On the general question of such duties the court in the case of *Downs* v. *United States*, T. D. 22984, G. A. 4912, Vol. 4, Treas. Dec. 405, in a well-considered opinion by Somerville, G. A., which was affirmed in 113 Fed. 144, and by the Supreme Court in 187 U. S. 496, 47 L. ed. 275, held: (we quote from the syllabus):

> The question whether a country pays or bestows a bounty or grant upon the exportation of an article, within the meaning of section 5, tariff act of 1897, lies, in its initiative with the Secretary of the Treasury.

It further stated, at p. 406:

> It is conceded, however, that the decision of the Secretary as to whether the laws of Russia do, in fact, bestow such a bounty or grant, is reviewable by this Board, as it involves the construction of the laws of Russia relating to the precise subject-matter covered by said section 5, above cited.

Section 5 of the Tariff Act of 1897, there involved was the correlative section to 303, *supra*, although the language of the earlier act was much narrower than that now in effect, in that it provided only for the assessment of countervailing duty when any "country, dependency, or colony" paid or bestowed a bounty or grant, whereas the present law adds to those terms the following: "province, or other political subdivision of government, person, partnership, association, cartel, or corporation."

That opinion further stated that it seems that the decision of the Secretary as to the *amount* of any such bounty or grant is conclusive on the courts, citing cases.

Also that:

> It is important to observe, in the consideration of this subject, that section 5 of the tariff act of 1897, under which this case arises, does not use the word "bounty" in any narrow or technical meaning. It embraces "any bounty or *grant*" bestowed or conferred by the Government, whether directly or indirectly. The word "grant" is more comprehensive in meaning than the term "bounty." It implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character, upon a corporation, person, or class of persons.

When the case reached the Supreme Court, that court stated:

> It is practically admitted in this case that a bounty equal to the value of these certificates is paid by the Russian government, and the main argument of the petitioner is addressed to the proposition that this bounty is paid, not upon exportation, but upon production. The answer to this is that every bounty upon exportation must, to a certain extent, operate as a bounty upon production, since nothing can be exported which is not produced, and hence a bounty upon exportation, by creating a foreign demand, stimulates an increased production to the extent of such demand.

In the case of *Nicholas & Co.* v. *United States*, 7 Ct. Cust. Appls. 97, T. D. 36426, the late Judge DeVries discussed the terms used in

the countervailing duty statute at length. Among other things he there stated:

"The law regards the substance, not the shadows, acts done, not the names by which these acts are designated." Whether the thing done be characterized an "allowance" or "bonification" or "bounty" or "grant" or "drawback" or what matters not. The question for the court is whether or not it is within the class of results sought by Congress to be equalized by this paragraph of the tariff act. That construction must be given the paragraph by the court which will most effectually accomplish its manifest purpose. *Arnold* v. *United States* (147 U. S. 494, 497).

The Supreme Court affirmed the opinion in the *Nicholas* case, *supra*, in 249 U. S. 34, 63 L. ed. 461. The opinion was written by Mr. Justice McKenna. After analyzing the argument of one of counsel he states, at p. 465:

We appreciate the strength of the argument, but circumstances are but aids to persuasion; they do not compel it. Every new statute is individual and presents its own problem. That before us does, and, as we have said, looking at its words alone, has no uncertainty of purpose. Whenever any country "shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise," there shall be levied and paid upon it, upon importation, in addition to the regular duty, an additional one "equal to the net amount of such bounty or grant, however the same be paid or bestowed." The statute was addressed to a condition, and its words must be considered as intending to define it, and all of them—"grant" as well as "bounty"—must be given effect. If the word "bounty" has a limited sense, the word "grant" has not. A word of broader significance than "grant" could not have been used. Like its synonyms "give" and "bestow," it expresses a concession, the conferring of something by one person upon another. And if the "something" be conferred by a country "upon the exportation of any article or merchandise," a countervailing duty is required by section E.

Continuing, the court uses this language:

Our conclusion is supported, we think, by *United States* v. *Passavant, supra,* a case from which counsel have adduced some argument. An importation of goods from Germany was the subject of the decision. That country imposed a tax upon merchandise when sold by the manufacturer thereof for consumption or sale in the markets of Germany. Upon exportation of the merchandise the tax was remitted. The remission was called "bonification of tax," as distinguished from being refunded as a rebate. The merchandise could be purchased in bond for exportation in the principal markets of Germany at the net invoice price and without paying the so-called German duty. The merchandise with which the case was concerned was so purchased.

The decision cites and discusses the *Downs* case, *supra*, in the following language:

*Downs* v. *United States*, 187 U. S. 496, 47 L. ed. 275, 23 Sup. Ct. Rep. 222, is a like example, and direct and indirect bounties are illustrated. As an instance of the former the amount paid upon the production of sugar under the Act of Congress of October 1, 1890 [26 Stat. at L. 567, chap. 1244], is adduced, and also the

"drawback" (the word of the statute is used) upon certain articles exported; as instances of the latter, that is, of indirect bounties, the remission of taxes upon the exportation of articles which are subject to a tax when sold or consumed in the country of their production is given, and, as another example, the laws permitting distillers of spirits to export the same without payment of an internal revenue tax or other burden.

With these authorities in mind we will examine the circumstances of this case for the purpose of determining the question at issue.

It appears from the testimony and from the exhibits in evidence that the importer during the month of January 1936 purchased at various times 800,000 registered marks from the Chase National Bank of New York City. The average price per mark paid was $0.21403, the lowest price being $0.2120 and the highest $0.21555 The registered reichsmarks thus purchased were transferred from the Chase National Bank registered deposit account in the Deutsche Bank in Berlin, Germany, to the F. W. Woolworth Co. registered deposit account in the same bank.

The term registered mark refers to those controlled marks which constituted the deposit made with the German Reichsbank originally under the German Credit Agreement of 1931, extended by the German Credit Agreement of 1933. It was impossible for German debtors to meet their obligations with foreign creditors. A compromise between German debtors, foreign creditors, the Reichsbank, and the Deutsche Golddiskontbank provided that the various amounts due foreign creditors should be deposited with a trustee under the control of the Reichsbank there to be registered as credit balances for the account of the foreign bank creditors on consideration that the foreign bank creditors were to discharge the claims held against German debtors. These controlled or registered reichsmarks could be withdrawn from the fund for certain agreed purposes only upon approval of German governmental authorities.

It must be borne in mind that in Germany the mark is the unit of currency. Because of the existence of these controlled or registered reichsmarks a nomenclature has come into use which creates the impression that there are two types of marks in circulation. This is not true, as we have stated above. The so-called free mark and the so-called registered or controlled mark, when it has been released in accordance with government regulations, each circulates freely for the same value even though the registered mark had been originally impounded with the trustee. Because of the restrictions that attach to the reichsmarks deposited in the Deutsche Bank under the German agreement (the registered marks), they were not permitted to circulate in Germany except upon compliance with the regulations established by that country in accordance with clause 10 (4) of said agreement (Exhibit 9). That agreement provides a number of methods by

means of which the registered reichsmarks or registered balances might be used. Clause 10 (7) (c) of said Exhibit 9 provides:

(c) Registered credit balances may be used for such other purposes to such extent and in such manner as the Reichsbank may approve.

Before these funds in registered reichsmarks could be withdrawn to be used in payment for merchandise to be exported, several things appear to have been required by the German authorities and regulations. First, that the manufacturer or his agent should procure the right to export the type of merchandise which he produced, in this case china novelties. He could accept payment for his merchandise on exportation in free reichsmarks without further government authority. If he exported his merchandise purchased in free marks he was entitled 'to a subsidy from the German government. Second, either the manufacturer or the holder of registered reichsmarks must procure authority from the German governmental agencies to use registered reichsmarks in payment for the manufactured goods in the amount previously fixed by said authorities. Third, notice must be given to the German authorities of the exportation of the merchandise purchased in whole or in part with registered reichsmarks, whereupon the registered reichsmarks are released for free circulation. Because of the restrictions upon the use of the registered reichsmarks and possibly to some extent because of manipulation, the value of such reichsmarks depreciated in the foreign markets but they were bought and sold openly. It is clear that if the manufacturer sold his merchandise for free reichsmarks for exportation and received a subsidy, his sale price would be lower than if he sold without subsidy or bounty. It is also clear that if the German government has established a procedure which will enable the German manufacturer and exporter to sell in the foreign market and accept in part payment these depreciated registered reichsmarks, which upon release in Germany would circulate freely and have the same value as the free reichsmark, then he could better compete in the foreign market.

We think the evidence shows that Germany has established such a scheme, because of her control over the currency and the exportation of the merchandise. The record shows that the importer, in contemplation of purchase of merchandise in Germany, had procured from the Reichsbank Direktorium a general permit in 1934 which was extended by various commitments to 1936, which is in the following language:

Please refer to your letter dated May 9, 1934, and our interim advice dated May 31, 1934—KA.56152/34, etc.—regarding the issue of a General Permit for the use of registered funds in connection with supplementary exports from Germany to F. W. Woolworth Co., New York and Toronto, and note that the following recommendation has been made in accordance with information received

in the meantime from the Reichsstelle fuer Devisenbewirtschaftung, Berlin W.8 (Foreign Exchange Bureau) under date of July 21, 1934—Dev. A 27143/34—:

Supplementary Exports of

(1) Toys of all kinds.

(2) Christmas Tree Ornaments.

(3) Tools and kindred articles, including sewing utensils (needles, hardware)— Remscheid articles in particular—

to the United States of America and Canada and the release of Registered Mark Funds amounting to 50% of the amount of the invoice in each instance are recommended. The total of all invoices shall not exceed RM 500,000.00.

Accordingly we approve that the F. W. Woolworth Co., New York and Toronto, effect payments of their deliveries of above commodities by German suppliers whose names are indicated on the enclosed lists, and which are valued at not more than Reichs Marks 500,000.00 of which 50% is to be charged to their own Registered Mark Account maintained at a German bank.

Conditions for this method of payment:

(1) The remaining 50% of the amount of the invoice is payable immediately after the shipment of the merchandise in foreign exchange or Free Reichsmarks (Reichsbank-notes and coins excluded) together with the amount to be charged to the Registered Mark Account at the German Bank instructed to make the payment. The German exporter, however, may dispose of these funds only when complying with the stipulated agreements, and after copies of invoices certified by the competent associations have been presented to us.

(2) Upon applying for offers, the German suppliers shall be informed that 50% of the amount of the invoice eventually to be issued will be paid in registered funds under the general permit issued to the F. W. Woolworth Co., New York and Toronto. When closing the deal or when placing the order, respectively, this method of payment shall be called *again* to the attention of the exporters in question.

(3) A sufficient selling price must be paid the German suppliers.

(4) A monthly statement in duplicate covering purchases of merchandise, itemized as to suppliers, commodities, prices, and amounts, shall be submitted to us by the F. W. Woolworth Co., New York, Toronto, and Berlin, respectively.

(5) This permit shall only cover orders placed within three months after date of issue of same. The orders can only be placed with the German suppliers whose names are shown on the attached lists.

(6) . The German Bank having your Registered Mark Account is required to file in each instance an application for the release of registered funds to be transferred under this permit with our department "Deutsche Kreditabkommen, Berlin SW 111, mentioning the above captioned journal number.

These applications for the release shall be submitted together with confirmations on which the payments of the part of the amount of the invoices payable in foreign exchange or free Reichsmarks to the German firms are indicated.

Furthermore, it will be necessary for you to request the German Bank having your Registered Mark Account, and that has been instructed to effect the payments to the German firms, to confirm these payments to the Treuhand Gesellschaft von 1933 m. b. H., Berlin SW 111, mentioning the above-captioned journal number.

The first permit was not introduced in evidence. Said Exhibit 2 does not appear to authorize the payment upon export for merchandise of the type involved herein, but Exhibit 3, which is a letter extending the general permit, includes porcelainware and names the manufac-

turer, Carl Scheidig, as one whose products might be exported. Scheidig was the manufacturer of the goods here involved.

Exhibit 5 herein, referring to the same general permit number, grants authority for the payment of 90 per centum of the purchase price of 16 cases to Carl Scheidig in registered-mark funds (registered marks).

Exhibit 6, a letter addressed by the Deutschbank and Disconto-Gesellschaft to the Deutsche Bank, illustrates the manner in which requests are transmitted for the release of registered reichsmarks and therein we note a request for release from the Chase National Bank fund for payment to Carl Scheidig for the account of the importer herein. On August 3 the same bank addressed a letter (Exhibit 8) to the importer advising that there had been released various registered marks in amounts as indicated; among others by a payment to Carl Scheidig in the sum as requested in Exhibit 6.

The closing paragraph of said Exhibit 8 states:

Kindly arrange for the submittal of the necessary documents to the Reichsbank.

The importer called as his principal witness Mr. A. Q. Smith who, in a very able, fair, and impartial manner, outlined all the facts of the purchase and importation which showed a complete compliance with the regulations of the German government by the importer in its method of procuring the merchandise in question.

It stands to reason that the importer would not resort to this complicated system required of him in order that he might use the registered reichsmarks, unless it was to his advantage so to do. In the instant case it appears that the advantage to him in United States dollars was $461.41, that being the amount of the countervailing duty assessed. The amount of countervailing duty cannot be questioned under the decisions heretofore cited.

Is this sum a benefit conferred upon "the manufacture or production or export of" the articles here imported by any "country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation"? The witness, Mr. Smith, testified that the Reichsbank issued the permit. We quote his testimony:

X Q. The Reichsbank when it issued this permit was acting either with private authority or with Governmental authority?—A. The Reichsbank issued that permit upon the recommendation of the Foreign Exchange Control Office and the Ministry of Economics, because the application for the permit is made to the Ministry of Economics, which, in other words, would be our Department of Commerce; * * *.

and again on p. 31 of the sten. min. this witness stated:

X Q. Well, the sale of such merchandise, however, is controlled by the Government, so you would say that it is not freely offered for sale?—A. It may be freely

offered for sale, but you could not export it from Germany. You can't export anything from Germany of any kind without a permit, irrespective of what you pay for it; it makes no difference how you pay for it.

An examination of the facts in this case shows (1) by a declaration of the importer through its manager, Oscar Dressel of Sonneberg, Germany, that marks 2,437.45 of the total invoice price of marks 2,488.43, were subject to special exchange regulations of the German government through a departmental officer or agency thereof; that such marks were received from a controlled account designated "Controlled Marks Account of the Chase National Bank of New York"; and that marks 278.80 of the purchase price were not subject to any special exchange regulation. That statement is verified by oral evidence produced at the trial. As heretofore stated, the average rate of purchase of the controlled mark was $0.2140 and the free marks were purchased at the official proclaimed rate, $0.4033, in Germany. The actual cost to the importer of registered marks 2,437.45 was $521.61 and of the 278.80 free marks $112.44, making a total cost of $634.05. The invoice value in marks as per consular invoice involved, including all charges was 2,716.25, which if purchased at the proclaimed rate of the mark in Germany would have amounted in dollars to $1,095.46. The total cost as above shown in United States dollars of the marks purchased was $634.05. The difference amounts to $461.41.

On July 28, 1936, as per Exhibit 5, F. W. Woolworth Co. requested the release of registered marks for the payment to Carl Scheidig of 16 cases of merchandise, which we presume included the 11 cases here involved. On July 29 of the same year (see Exhibit 6) the Deutsche Bank und Disconto-Gesellschaft requested the release of the registered-mark account of the Chase National Bank in the amount of money referred to in Exhibit 5. One statement in said Exhibit 6 is that—

The Fachverband (Agency) will send you the certified copy of the invoice after same has been approved.

On August 1, 1936, as per Exhibit 7, the Reichsbank Abeilung Deutsche Kreditabkommen agreed to the payment of Reichsmarks 3,468.65, the equivalent of 90 per centum of the value of a shipment made by Carl Scheidig, Graefenthal, Thur., according to the invoice or invoices dated July 23, 1936, totaling reichsmarks 3,854.05 for the account of F. W. Woolworth Co., New York, under registered-mark permit KA 113427/34 of the Chase National Bank of New York, to which reference was made in the previous exhibits noted.

Pursuant to this authority payment was made in full to the manufacturer, Carl Scheidig, 90 per centum of his invoice price being from the registered marks and 10 per centum from the free marks. Until this payment had been made the registered reichsmarks could not circulate in Germany. Upon release the exporter received 2,716.25 marks for his

merchandise which at the market price in Germany amounted to $1,095.46 and therefore he received a benefit of $461.41 solely because of the restrictions on exportation and the control of the currency as exercised by the German government. This benefit constituted a bounty or grant within the meaning of section 303, *supra*.

For the foregoing reasons we find that the assessment of countervailing duty was in conformity with the law. The plaintiff's claim is therefore overruled and judgment will be rendered for the defendant.

It is so ordered.