**MICHELIN TIRE CORPORATION**

v.

**UNITED STATES.**

**C.R.D. 79–6; Court No. 75–9–02467.**

United States Customs Court.

Feb. 26, 1979.

272

Windels, Marx, Davies & Ives, New York City (Paul Windels, Jr., John Y. Taggart, New York City, of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (David N. Cohen, Chief Customs Section, Edmund F. Schmidt, Trial Atty., New York City, for defendant.

WATSON, Judge:

This matter is before the court on defendant's motion for summary judgment.

█ Plaintiff commenced this action pursuant to 28 U.S.C. § 2632 to contest the denial of its administrative protest against the assessment of countervailing duties on tires it had imported from Canada. The levy of that additional duty was made pursuant to Section 303 of the Tariff Act of 1930.[1] In general terms, the involved statute requires the assessment of additional duty when a bounty or grant is bestowed on the manufacture, production or export of an imported article.

█ In the motion for summary judgment defendant argues that this court is restricted to reviewing the facts contained in the record of the Secretary of the Treasury's administrative investigation into the question of the existence of a bounty or grant. Defendant further argues that this court is limited to judging whether the resulting decision of the Secretary of the Treasury[2] was unreasonable, arbitrary or capricious.

Defendant also seeks a summary judgment without regard to the asserted restrictions on the court's power to try the issues in the case. However, defendant's continued emphasis on such restrictions led plain-

---

1. Act of June 17, 1930, ch. 497, Title III, Part I, § 303. 46 Stat. 687 (current version at 19 U.S.C. § 1303 (1977)).

2. Treas.Dec. 73–10.

tiff to concentrate on this point. This resulted in an imprecise and incomplete confrontation between the opposing contentions. In its present form the motion does not present a clear formulation of the dispute and does not persuade the court that material factual issues are entirely absent.

To a certain extent the awkwardness of the motion and the confusion it engenders is derived both from defendant's insistence on a restricted court proceeding and from plaintiff's preoccupation with the conduct of the administrative investigation in which the Secretary of the Treasury found that a bounty or grant was being bestowed on these tires.

Once it is made clear that this is an independent action in which this court has the power to determine all disputed questions of fact or law concerning the correctness of the assessment of this additional duty, the court expects the confusion to dissipate. However, the fact that a question as to this court's power to try the issues in this case is being repeatedly raised[3] and vigorously pressed by the government more than 80 years after the creation of countervailing duty legislation[4] indicates that a state of confusion exists, or is developing, with regard to the function of this court.

Therefore, the court believes that this matter needs fundamental re-examination in order to restore the proper focus of this action; encourage the complete resolution of its issues; and generally clarify this aspect of proceedings in the court.

Defendant bases its contentions on an argument that judicial inquiry in this action is governed by general principles of judicial review of administrative actions. Defendant argues that under those principles and, in the case of statutory silence on the matter, (particularly in the absence of a specific provision for trial *de novo*), the scope of judicial "review" is confined to the adminis-

trative record, or is shaped by the particular administrative proceeding being "reviewed." Defendant also argues that the restrictions it espouses have been applied to the role of this court in cases involving duty assessed under the flexible tariff provisions (Section 336 of the Tariff Act of 1930, 19 U.S.C. § 1336) and the Antidumping Act of 1921 (19 U.S.C. §§ 160 et seq.)

Defendant also relies upon a recent decision of this court in which general principles of judicial review of administrative action were utilized as the basis for a finding of subject matter jurisdiction. *Suwannee Steamship Co. v. United States*, 70 Cust.Ct. 327, C.R.D. 73–3 (1973).

Defendant's arguments go on to include the alleged latitude given to the Secretary of the Treasury in making his investigation into the existence of a bounty or grant; the purported exercise by the Secretary of judgments in the political, legislative, or policy spheres; and the asserted futility of the administrative investigation if the issue is tried "de novo" before this court.

In this opinion the court concludes that this action is an independent civil action commenced and conducted in the form and manner provided by statute.

Examination of the basic and related statutory terminology shows clearly that this court is to determine all relevant issues of fact and law in actions within its subject matter jurisdiction. It is further determined that this judicial proceeding is not a mere review of a record created on the administrative level and is not a review in an appellate sense of any particular administrative action or proceeding. The purported restrictions on this court's power to try and judge all relevant issues of fact and law are found to be without support in the statutes and case law. In fact, those sources support the opposite conclusion. Moreover, historical analysis shows that this type of action existed *before* the adminis-

---

**3.** Defendant's earlier motion to limit the scope of trial, in essentially the same respects as are advanced in this motion was denied in *Michelin Tire Corporation v. United States*, 81 Cust.Ct. ——, C.R.D. 78–12 (1978).

**4.** Tariff Act of 1897, Ch. 11, § 5, 30 Stat. 205.

trative process of which defendant would make it a mere review. Thus, the correct view of this action is derived from the statutory expressions of legislative intent, the case law, and the true historical nature of the action. In light of these fundamental sources of the court's authority the administrative phase affects the conduct of these judicial proceedings in only two respects. First, the content of the administrative activity defines the subject matter jurisdiction of the court and second, the exhaustion of the remedies offered on the administrative level is a procedural requirement for the commencement of the independent action in this court. Beyond that, the administrative phase has no bearing or influence on the manner in which this court determines issues of fact and law.

Issues are before this court as a result of the commencement of an independent civil action provided by Congress, not by virtue of the operation of the Administrative Procedure Act (5 U.S.C. §§ 551, et seq.) or pursuant to general principles of judicial review of administrative actions. Accordingly, restrictions on judicial inquiry derived from those sources are inapplicable.

Restrictions expressed in decisions regarding other areas of customs law are either unclear, distinguishable, or based on outmoded considerations. Arguments founded on unusual or discretionary powers purportedly given to the Secretary of the Treasury in matters of countervailing duty are erroneous.

■ The court concludes that, within the subject matter jurisdiction granted to it by Congress, it is the exclusive, unlimited and unrestricted forum for the determination of all relevant issues of fact and law. Its powers are unaffected by the manner in which some issues may have been decided on the administrative level.

---

**5.** P.L. 91–271, Title I, § 113, 84 Stat. 279.

**6.** Act of June 17, 1930, c. 497, Title IV, Part III, § 515, 46 Stat. 734.

**7.** Justice Cardozo used this phrase in *Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1932).

---

## I. *The Statutes*

### A. 28 U.S.C. § 2632

The proper starting place for determining the complete nature of a judicial proceeding in this court is the statute which allows the commencement of the action, namely 28 U.S.C. § 2632(a):

> A party may contest (1) denial of a protest . . . by bringing a civil action in the Customs Court.

The very existence of a statutory starting point for analyzing the nature of an action before this court as a distinct action, is a matter of importance. For prior to the enactment of § 2632 in 1970[5] there was no statutory provision for the commencement of an independent action in this court. Instead, the court was simply the automatic recipient of the papers in a dispute commenced on the administrative level. Briefly stated, the prior statutory provisions for the administrative review of decisions contained a further step directing the transmittal of the final administrative decision together with the entry and the accompanying papers to the Customs Court for judicial resolution. See for example, Section 515 of the Tariff Act of 1930, in the pre-1970 form.[6]

This was a reflection of the fact that the court was a continuation of the Board of General Appraisers. The Board was an administrative tribunal which conducted hearings of customs disputes with "the inciden[ts] of a trial in court".[7] It developed from legislation passed in 1890[8] which provided for a level of administrative review by "general appraisers" and subsequent appeals to the circuit courts (the district courts of the time.)[9] The evolution of the

---

**8.** Act of June 10, 1890, Ch. 407, 26 Stat. 131.

**9.** For a time these "appeals" were, in effect, trials because the introduction of new evidence was permitted in the circuit courts. This ended when appeals were restricted to the record before the Board of General Appraisers. Act of May 27, 1908, ch. 205, Sec. 2, 35 Stat. 403, 404. In 1909 the Court of Customs Appeals was

Court from the Board of General Appraisers, the Court's inheritance of the Board's antiquated and convoluted forms of hearings, and the lack of a clear separation from the administrative process, may have tended to retard the perception of the court as an independent judicial institution. If the circumstances of this court's evolution had any part in the development of a mistaken impression as to its powers, the impression was eliminated by Congress in the 1970 legislation.[10] The legislative history of that Act displays a profound awareness of the archaic forms within which this court was functioning. The Senate Committee report noted that "[i]n many respects, the court has continued to function as would an administrative tribunal reviewing the actions of the Bureau of Customs, despite the fact that in 1956 Congress declared it to be an Article III court." [11]

In 1970 Congress did not simply create a civil action where none had existed before. Among other things, it eliminated the single characteristic of this court which most impeded the recognition of its full independent judicial powers. The 1970 law ended the automatic receipt of administrative disputes, the most glaring vestige of the entanglement of the court's immediate predecessor with administrative procedures. Since 1970 it is no longer possible to mistake this court for an appendage of the administrative process. Now, in the subject matter assigned to it by Congress, this court unequivocally represents the judicial power of the United States under Article III of the Constitution. The 1970 Act ended any possible implication that the scope of the action in this court was influenced or governed by the form of prior phases of administrative proceedings.

It is not only by contrast with the anachronistic manner in which this court formerly received disputes that § 2632 is an important development. By its own terms and by the meaning of its plain language, § 2632 expresses the existence of an unrestricted trial of all issues in actions commenced in this court.

The use of the term civil action is of paramount importance. The right to bring an action in court, be it of common law or statutory origin, is obviously indivisible from the right to a trial of the issues in that action. This can be viewed either as a right of the litigant or a power of the court. In this regard, Mr. Justice Grier stated that "[i]t is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the case. . . ." *Peck et al. v. Jennes et al.*, 48 U.S. (7 How.) 612, 624, 12 L.Ed. 841 (1849).

If the right of action is expressed in a statutory form, it is reasonable to expect any restriction on the right to a trial of the issues to be similarly expressed. It cannot be presumed that, without any indication whatsoever, Congress designed an action which is intended to fluctuate on trial in accordance with the extent to which the issues may or may not have been explored on the administrative level.[12]

created to hear those appeals from decisions of the Board of General Appraisers. Act of August 5, 1909, ch. 6, Sec. 29, 36 Stat. 11, 105. The restriction of the appeals to the record before the Board corresponded with the institution of complete trials before the Board of General Appraisers, as if it were a court in all but name. See, T.D. 34666—G.A. 7589 (1914).

10. Other peculiarities derived from the Board of General Appraisers were eliminated in the 1970 Act. Notable among them were entirely separate procedures for classification cases (decided by a three judge "division"—even when heard outside New York by a single judge) and value or "appraisement" cases (decided by a single judge with a right to review before a three-judge "appellate term" of the court itself). In addition, in appeals from the Customs Court, the Court of Customs and Patent Appeals would judge the facts as well as the law in classification cases. See, S.Rep.No. 91-576, 91st Cong.; 1st. Sess. 13 (1969); H.R. Rep.No.91-1067, 91st Cong. 2d Sess. 12 (1970).

11. S.Rep.No.91-1067, 91st Cong. 2d Sess. 3 (1970).

12. Care must be taken not to confuse the restriction on the subject matter jurisdiction of the court (which is abundantly clear) with restrictions on the trial of issues which arise *within* its proper subject matter jurisdiction.

The fact that the civil action provided for in 28 U.S.C. § 2632 raises issues which may have been touched upon in earlier administrative stages, does not diminish the significance of the term "civil action." For example, the statutory term "civil action" has been held to require a trial *de novo* when used to describe the law suit which can be brought following an adverse administrative determination (after a full quasi-judicial hearing) of an employee's discrimination complaint. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

The *Chandler* case resolved a conflict between the decisions of the courts of appeals concerning the nature of the judicial proceeding provided by § 717(c) of the Civil Rights Act of 1964.[13]

The Statute permitted a federal employee who had complained of employment discrimination to file a civil action against the head of the appropriate agency following either an adverse administrative determination of the complaint or administrative inaction. The Supreme Court reversed the lower courts' holdings that the statute did not require a trial *de novo*. The Supreme Court rejected the view that the statute would be satisfied by a mere review of the administrative record. In so doing, the Supreme Court relied on the plain meaning of the statute, the statement of the action in terms of the civil action available to private-sector employees (which was already established as *de novo*) and the legislative history. The Supreme Court singled out the *specific statutory authorization of a civil action* to distinguish the circumstances from those in which *de novo* review was not presumed. It thereby also distinguished cases involving review of agency action under the Administrative Procedure Act and cases in which the standards to be used or procedures to be followed were set forth in the relevant statutes.

The Supreme Court's distinction of *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), is particularly instructive. In the *Bianchi* case the Supreme Court held that Congress intended to limit judicial review when it provided in the Wunderlich Act[14] that the decision of a government agency on a question of fact arising under a "disputes" clause of a government contract, would be final and conclusive " 'unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.' " In contrast, the Supreme Court characterized § 717(c) of the Civil Rights Act of 1964 as follows:[15]

Here Congress has not "simply provided for review" but has affirmatively chosen to grant federal employees the right to maintain a trial *de novo*.

In most instances, of course, where Congress intends review to be confined to the administrative record, it so indicates, either expressly or by use of a term like "substantial evidence," which has "become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court." [citation omitted]

In the circumstances presented in this countervailing duty action there are many additional, positive indications of the completeness of the judicial proceedings.

The use of the phrase "contest the denial of a protest" has in it no indication of any limitation on the trial of issues arising in this litigation. Literally, the phrase means to dispute the refusal to grant the requested relief, after that relief has been sought in the vehicle provided for administrative review. This statutory language is the broadest possible expression of the content of the civil action, given the fact that under the statute administrative relief must be exhausted before a civil action can be commenced.

---

13. As added by § 11 of the Equal Employment Opportunity Act of 1972, 86 Stat. 111, 42 U.S.C. §§ 2000e–16(c) (1970 ed., Supp. IV).

14. Act of May 11, 1954, 68 Stat. 81.

15. *Chandler v. Roudebush, supra*, 425 U.S. p. 862, n. 37, 96 S.Ct. 1949, 1960.

The action is therefore brought to contest the administrative refusal to grant relief. Beyond that refusal the nature of the particular administrative decision, action or proceeding which led to the dispute, has no bearing on the manner in which the court conducts the trial of the civil action. The civil action was not expressed by Congress as a function, or outgrowth, or contest of any single, underlying administrative step. The power of this court to try the action is therefore the power to decide any issue which is relevant to a proper judicial decision. Suppositions as to how a particular issue would be decided if a court was to scrutinize it in the absence of a specific, distinct statutory procedure, are irrelevant.

It is particularly significant that the action is commenced in this court to "contest," not to "review." The former word carries no implication of restriction to a record and has no meaning other than a complete challenge to the final denial of relief at the administrative level. Congress has shown a complete familiarity with its power to restrict "reviews" in other areas by providing a specific provision for scope of review. See for example, the scope-of-review-provision applicable to certain orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Federal Reserve Board and the Federal Trade Commission, 15 U.S.C. § 21(a) or, of course, the scope-of-review-provision of the Administrative Procedure Act, 5 U.S.C. § 706. Congress provided nothing of this sort with regard to actions in this court. In fact, Congress eliminated an appearance of the word "review" in the course of its 1970 revision. It repealed 28 U.S.C. § 1583 [16] which formerly gave this court jurisdiction "to review on protest the decisions of any collector of customs." It should be noted that the repealed language never gave rise to reviews of records in the sense desired by defendant. It was, in all probability, a use of the word review in its most general sense. In any event, the present statute, shorn of any references to review, no longer allows even room for confusion on this point.

In addition to the very existence of this action and the plain meaning of the statutory language under which it is commenced, support for the unlimited nature of the trial of all issues of facts and law also derives from the requirement of consistency in the interpretation of statutes.

This civil action could raise factual issues which originate in agency action taken after the administrative investigation and countervailing duty order of the Secretary of the Treasury, i. e., the identity and quantity of the subject merchandise, the date of exportation and country of exportation or the f.o.b. value of each tire on the date of importation. As to these potential issues, the defendant concedes a "de novo" trial because these matters were decided by the District Director without the creation of an administrative record. But it is not *who* makes the particular decision, or the degree to which administrative records are fashioned in the various phases of the administrative process which determines the court's scope of trial—*not when a single, specific statutory cause of action has been provided which is not related to any one phase or level of the administrative proceeding.* Indeed, if this were not the case the Secretary of the Treasury could, by administrative fiat, determine the extent to which the judicial power of the United States will apply to decisions made by him or his subordinates. This could be done by the simple expedient of making any chosen determination the subject of a recorded investigation on the administrative level. Carried to its logical conclusion defendant's reasoning would permit the Secretary of the Treasury to conduct an administrative investigation into a question of valuation or classification; make a record; issue a ruling or order, and the subsequent court trial of the issue so decided would be confined to a review of the administrative record and limited to deciding whether the ruling was "reasonable."

Defendant's attempt to distinguish between the trial of a classification or valuation dispute and a countervailing duty dis-

16. Act of June 25, 1948, ch. 646, § 1, 62 Stat. 943.

pute founders on the same statutory shoals. The very same civil action that challenges the one, also challenges the other, and the statute itself draws no distinction between these challenges. Congress expressed no special treatment for matters which may have been the subject of investigation, or the subject of some recorded proceeding by the administrative agency.

There is no indication whatsoever in the statute to suggest that the nature of the trial of certain issues in these civil actions is to fluctuate in accordance with the manner in which the matter is treated at the administrative level. In fact, as noted earlier, even if the denial of the protest was based on a quasi-judicial hearing the right to a civil action would mean a trial *de novo*, in accordance with the reasoning in *Chandler*, and in the absence of any contrary expression of legislative intent.

The attempted distinction between the trial of classification and valuation issues and certain countervailing duty issues will not be imputed to a statutory scheme which expresses no distinctions between them. Such an attempt would only generate confusion and lack of uniformity in a statutory plan designed to foster a comprehensive, consistent, and exclusive system of justice in tariff matters.

If, as defendant concedes, this civil action could raise a number of separate issues, some subject to complete trial while others would be decided upon a review of an administrative record, the source of this purported disparity in the scope of the trial obviously is not the single statute which allows the action.

### B. Statutes Governing the Power of the Court

We turn next to those statutes pertaining to the powers of the court and its conduct of actions commenced before it. In those supporting provisions there are further indications of the court's power to try all issues of fact and law and no indication of limitations. In this respect, the technique used in *Chandler* of analyzing the related statutory terminology employed by Congress [17] is revealing. We find the statutes replete with references to trials and devoid of any potentially limiting expressions such as "review." Thus, in 28 U.S.C. § 253, the Chief Judge of the Customs Court is empowered to designate judges to "try any case" and in 28 U.S.C. § 255 he is authorized to designate three-judge panels in certain cases to "hear and determine any civil action . . . ." and in 28 U.S.C. § 256 to designate judges to preside at a "trial or hearing."

In 28 U.S.C. § 1582 the Customs Court is given exclusive jurisdiction of the civil actions authorized by § 2632. While in itself this provision is of interest for the indication it gives of the subject matter jurisdiction of the court, it is of greater interest because of what it replaced. As noted earlier, the prior statute (28 U.S.C. § 1583) gave the court exclusive jurisdiction "to review on protest the decisions of any collector of customs." While this was no certain indication of a lesser scope of trial than presently exists, it clearly indicates the vestiges of the court's administrative origins, and perhaps the origin of the confusion which persists today as to its powers.

In 28 U.S.C. § 2637 the parties before this court are given the right to introduce evidence "*in any proceeding.*" [18] This right in itself is a clear indication that none of the actions conducted in this court are restricted by statute to a preexisting record.

---

17. 425 U.S. at 845, 96 S.Ct. 1949.

18. Although this provision explicitly contradicts defendant's argument for restriction to an administrative record, it merely states the obvious. Actually, this provision is a relic of a time when it was needed to furnish this elementary right in an administrative proceeding in which it might not otherwise have been available. See, Sec. 28, subsec. 13, Tariff Act of 1909, Act of August 5, 1909, ch. 6. Sec. 28, subsec. 13, 36 Stat. 99, 100. See also, Sec. III, subsec. M, Tariff Act of 1913, Act of Oct. 3, 1913, ch. 16, Sec. III, subsec. M, 38 Stat. 187. It could hardly be argued that a special statutory provision is needed to allow parties to introduce evidence and cross-examine witnesses in an independent action in federal court.

*Hugo Stinnes Steel and Metals Co. v. United States*, 80 Cust.Ct. 175, C.D., 453 F.Supp. 94 (1978) appeal pending.

### C. 19 U.S.C. § 1303
#### The Countervailing Duty Statute

Having found evidence of an unrestricted trial of all issues in the statutes dealing with this cause of action and with the court's powers, we move to the statutes which provide for the administrative assessment of countervailing duty and for the related proceedings in customs administrative review.

The first statute examined is the statute pursuant to which the Secretary of the Treasury made the determination of the existence of a bounty or grant; the determination which led to the order upon which the assessment of duty contested in this action was based. Section 303, Tariff Act of 1930, Act of June 17, 1930, C. 497, Title III, Part I, § 303, 46 Stat. 687.

"Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article of merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article of merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Sec-

retary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties."

There is nothing in this statute which indicates a restriction of the court's power to independently determine the existence of a bounty or grant if that issue arises in a civil action. In fact, this provision makes no mention of any particular means by which the existence of a bounty or grant was to be determined. The argument that the statutory scheme was for the ultimate legal action to be a review of the record of an administrative investigation is therefore highly problematical.

It should be noted that a formal investigation was not required until the 1975 amendment, which expanded the administrative procedures to be followed in arriving at a determination of the existence of a bounty or grant.[19] But even had some statutory mandate for formal investigation existed at the time relevant to this action, it would not have shown any legislative intention that the result of the investigation (or the fact that there was an investigation) should influence or control the scope of a later trial.

### D. Customs Administrative Statutes

Of the statutes dealing with administrative proceedings in customs matters, 19 U.S.C. § 1514, which provides for the finality of administrative decisions, is of basic importance.

If there were to be an expression of restriction of a later trial of issues arising from administrative action this is one of the places where one would expect to find it. In relevant part 19 U.S.C. § 1514 reads as follows:

---

**19.** Act of Jan. 3, 1975, P.L. 93–618, Title III, Chap. 3, § 331(a), 88 Stat. 2049.

[D]ecisions of the appropriate customs officer, including the legality of all orders and findings entering into the same, as to—

(1) the appraised value of merchandise;

(2) the classification and rate and amount of duties chargeable;

(3) all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury;

(4) the exclusion of merchandise from entry or delivery under any provision of the customs laws;

(5) the liquidation or reliquidation of any entry, or any modification thereof;

(6) the refusal to pay a claim for drawback; and

(7) the refusal to reliquidate an entry under section 520(c) of this title [19 U.S.C.S. § 1520],

shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Customs Court in accordance with section 2632 of Title 28 [of the United States Code 28 U.S.C.S. § 2632] within the time prescribed by section 2631 of that title.

This provision is completely free of any legislative expression of the standards by which the disputed administrative decisions are to be judged in court. The contrast between this provision and the provision for the finality of agency decisions under the Wunderlich Act, discussed in connection with *United States v. Bianchi & Co., supra,* is clear. This provision does not contemplate judicial review of administrative records and does not contain any expressions which would limit the inherent power of the court to decide all issues of fact and law arising in the actions before it.

Moreover, § 1514(a) explicitly makes the finality of "all orders and findings entering into the [decisions of the appropriate customs officer]" subject to a civil action commenced in this court. It would be difficult to fashion a more complete expression of the totality of administrative activity which is subject to challenge in court. In conjunction with 28 U.S.C. § 2632 this provision forms part of a distinct statutory scheme in which the action for judicial relief in these tariff areas was specifically expressed by Congress without limitation or restriction. Accordingly, those cases expressing standards of judicial review for administrative proceedings in the absence of distinct statutory provisions granting access to the courts [20] and those cases dealing with statutes that explicitly restrict review [21] are distinguishable.

## II. *Countervailing Duty Cases*

As mentioned at the outset of this opinion, it is also important that the restrictions espoused by defendant have not been adopted by the courts although a history of litigation on the subject of countervailing duties exists. The passing mention [22] of "the administrative record we review in this case," in a ruling on the admission of evidence, is tenuous support for so important a restriction and must be viewed as an unexplained deviation from the norm.

In a number of countervailing duty cases it is clear that factual evidence was introduced in this court, in addition to that which was gathered by the Secretary of the Treasury. Such alleged generators of bounties and grants as a Uruguayan multiple exchange rate [23] and German currency

**20.** *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

**21.** *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.*

*v. United States,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

**22.** In *American Express Co. v. United States,* 67 Cust.Ct. 141, 143, C.D. 4266 (1971) *aff'd* 60 CCPA 86, C.A.D. 1087 (1973).

**23.** *Energetic Worsted Corp. v. United States,* 51 Cust.Ct. 55, C.D. 2413 (1963) reversed. *Same v. Same,* 53 CCPA 36, C.A.D. 874 (1966).

values and trade practices [24] have been the subject of proof on trial in the court.

In fact, the matter was explicitly discussed in *V. Mueller & Co. v. United States,* 28 CCPA 249, C.A.D. 152 (1940) in which the Court of Customs and Patent Appeals held that the Secretary of the Treasury, in making a decision to order the assessment of countervailing duties did not have to set forth the particular manner in which the bounty or grant was paid or bestowed. The court then stated: (28 CCPA 257)

> We do not mean to be understood as holding the appellant [importer] had not the right to bring forward any questions of fact relating to the transaction and have them tested by the applicable law, but *the burden of showing the facts in detail rested upon it,* and it was not incumbent upon the secretary to go further than he went in this regard. [Emphasis supplied]

Generally, in cases involving the assessment of countervailing duties the parties have always had the right to introduce evidence concerning the factual issues in the case. If, for the most part, they chose to rely on the facts ascertained by the Secretary of the Treasury, the reliance was not under compulsion but was only due to a lack of dispute as to the facts. Needless to say, the right to introduce evidence in court is possessed by both parties and both may conceivably benefit from the exercise of that right.

It is also clear that this court's standard of judging the question of the assessment of countervailing duty has always been the standard of correctness under the law. See, *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). That standard of decision is the traditional standard for legal actions which are not mere reviews of administrative records.

The less rigorous standard of whether the action or determination of the Secretary of the Treasury was reasonable, arbitrary or capricious is not applicable in these matters. That lesser standard generally may apply in judicial review obtained under the Administrative Procedure Act or general principles of judicial review of administrative actions. As must be reiterated, this action is an independent civil action, not derived from rights or powers of "review" in the limited sense.

Because the action in this court is an independent civil action and because the civil action is not stated in terms of review of any particular administrative proceeding and does not contain any limitations on scope or standard of review or references to external sources of any kind, there is no reason to look to the Administrative Procedure Act or general principles of judicial review of administrative action. Congress was quite capable of specifying the applicability of the Administrative Procedure Act in this area if it chose to do so. As noted earlier, Congress was equally conversant with those terms which might indicate the existence of something less than a complete trial of all the issues.

If the court is to make an independent judgment as to whether the statutory conditions existed for the assessment of the contested duty it cannot be confined to an administrative record.[25] This is particularly the case when that record is not required by statute. The fact that plaintiff here may have been allowed to submit information in the investigation does not affect the analysis that the statutory scheme contemplates that the *first* mandatory, unrestricted hear-

24. *F. W. Woolworth Co. v. United States,* 3 Cust.Ct. 236, C.D. 244 (1939), affirmed. 28 CCPA 239, C.A.D. 151 (1940).

25. To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the fact finder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents. Thus, the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding these rights.
*Speiser v. Randall,* 357 U.S. 513, 520, 521, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1957).

ing of all disputed issues of fact and law shall be in the Customs Court.

In sum, the scope of authority of this court is not limited to reviewing administrative records. This court does not review the record of a proceeding by which the protest was denied. It does not review the record of a proceeding by which the duty was assessed. It does not review the record of the proceedings in which underlying facts such as the existence of a bounty or grant were determined. It does not review *anything* in the sense of a review confined to a record. It hears and determines the factual and legal issues in an independent action.

### III.

■ Defendant's argument for restrictions on the scope of trial in the form of limiting the court to review of the record of an administrative investigation and to a "reasonableness" standard of decision overlooks other important aspects of this action. These are the true objects of the action, its historical nature, and its due process implications, all of which are interrelated.

The true practical and historical purpose of this action is the recovery of duty alleged to have been unlawfully exacted. The action is not generated by the investigation of the Secretary of the Treasury or the conclusion it reached. In fact, plaintiff had to wait until the Secretary's decision that a bounty or grant was being bestowed became embodied in an exaction of duty and until its administrative protest against that exaction was denied before it could commence an action in this court. Plaintiff had and has no right to immediate judicial review, directed at the administrative determination that the articles it was importing or planning to import were benefiting from a bounty or grant. Accordingly, there is absolutely no reason to subject the additional aggrievement to limitations which imply

that the action was only aimed at the initial administrative determination. In reality, plaintiff has resorted to an action which is the current statutory substitute for the common law actions by which excessive duty payments originally were recovered. As such, there are definite constitutional limits to the alterations which may be made in the trial of the action. See, *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 343, 57 S.Ct. 816, 81 L.Ed. 1143 (1936).

Originally, an action to recover duties was a common law action in *assumpsit* with trial by jury based on an implied promise by the government official (the Collector of Customs) to refund money which the law did not authorize him to collect.[26] *Elliot v. Swartwout*, 35 U.S. (10 Pet.) 137, 9 L.Ed. 373 (1836). *Cf. Stone v. White*, 301 U.S. 532, 534, 535, 57 S.Ct. 851, 81 L.Ed. 1265 (1936).

The collectors began accumulating enormous funds to protect themselves against possible liability. In some cases, defalcations and embezzlements occurred. This led to the passage of a law in 1839 requiring the collectors to pay the collected duties immediately to the United States Treasury.[27] That act also provided that " . . . whenever it shall be shown to the satisfaction of the Secretary of the Treasury, that in any case of unascertained duties or duties paid under protest more money has been paid to the collector . . . than the law requires should have been paid, it shall be his duty to draw his warrant upon the Treasurer in favor of the person or persons entitled to the overpayment, directing the said Treasurer to refund the same out of any money in the Treasury not otherwise appropriated." In *Cary v. Curtis*, 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1845) the Supreme Court held that this statute terminated the common law action against the collector. However, strong dissents by Justices Story and McLean

---

**26.** In its historical analysis this opinion relies heavily on material contained in Joseph E. Lombardi's, The United States Customs Court—A History of Its Origin and Evolution (1976). (United States Customs Court Library)

**27.** Act of March 3, 1839, ch. 82, Sec. 2, 5 Stat. 339, 348–349.

led quickly to an explanatory act[28] in which Congress declared that nothing in the 1839 law should be construed as taking away from the importer the right to maintain an action at law against the collector provided the payment was made under protest.

Although the rationale of Justice Stóry's dissent is not fully reflected in the recent customs law decisions, it is nevertheless a reminder that there is an irreducible core of legal rights possessed by one who has been subjected to an illegal duty by government officials. The courts are the only secure safeguard for those rights. This was the jurisprudential ground upon which Justice Story relied when he stated at 44 U.S. 253:

> I know of no power, indeed, of which a free people ought to be more jealous than of that of levying taxes and duties; and yet if it is to rest with a mere executive functionary of the government absolutely and finally to decide what taxes and duties are leviable under a particular act, without any power of appeal to any judicial tribunal, it seems to me that we have no security whatsoever for the rights of the citizens.

Justice Story's opinion was discussed in a law review article by Judge George Stewart Brown of this court. 26 Va.L.Rev. 759 (1940). The following perceptive comments are found at page 767.

> This brilliant opinion by Judge Story is seldom quoted by lawyers in their briefs, and by judges in their opinions, probably because of the conventional report of it as a dissent, although it would often be appropriate authority in cases dealing with the intent and purpose of Congress in establishing a statutory judicial review in matters of taxation, in substitution for the common law remedies. This is probably because the legal incident, the subject of this paper, through the prompt action of Congress, which made it the law of the land so soon after being filed, is not gen-

erally known. Certainly a dissenting opinion which thus immediately became the law is sound authority to quote.

The original common law remedy for the recovery of taxes illegally collected was so broad and all inclusive upon both questions of fact as well as questions of law that to give a narrower, less inclusive construction to the present statutory remedies would seem to be inadmissible as in degradation of the common law. *Statutes giving a right to sue the government where no remedy existed before, such as many matters coming before the Court of Claims, are, of course, subject to a strict construction. The converse, however, is true about statutes which perfected and improved and made applicable to modern conditions, and ancient common law remedy which had always existed, to protect the citizens' elementary right not to be taxed illegally.*

There is a widespread and spirited discussion now going on in the Law Reviews over what is called administrative law, governing suits between the government and its citizens. The particular phase of administrative law now being extensively debated is how far, that is, to what extent, should there be a judicial review of administrative governmental action. *Mr. Justice Story in the quoted opinion presents seemingly unanswerable arguments that, so far as taxation is concerned, which may be in a class by itself, such judicial review of administrative action must necessarily include a review of the facts as well as the law in order to be effective and to establish complete justice between the citizen and his government.* [Emphasis supplied]

The principles expressed by Justice Story continued to be followed by Congress in later years. In 1864, legislation continued the right of action against the collector but the maintainance of the action was not allowed unless an appeal to the Secretary of the Treasury was decided, or not acted

---

28. Act of February 26, 1845 (5 Stat. 727, also in footnote at 5 Stat. 349).

upon, within certain time limits.[29] This development was characterized as follows in *Arnson v. Murphy,* 109 U.S. 238, 243, 3 S.Ct. 184, 188, 27 L.Ed. 920 (1883):

> . . . [I]t is apparent that the common-law action recognized as appropriate by the decision in *Elliot v. Swartwout,* . . . has been converted into an action based entirely on a different principle,—that of a statutory liability, instead of an implied promise,—which, *if not originated by the act of Congress,* yet is regulated, as to all its incidents, by express statutory provisions. [Emphasis supplied]

The decision in the *Arnson* case was to preclude the application of a *state* statute of limitations to the federal action for recovery of duties. Inherent in the Supreme Court's opinion was the recognition that the original common-law action was at the core of the statutory procedural framework.

The *Arnson* opinion also reveals that the statutory action was related to the nascent administrative review only insofar as the administrative steps were a procedural prerequisite to the commencement of a court action. The court action, therefore, clearly was not a review of administrative proceedings but was the statutory continuation of a preexisting common law right of action.

In the Customs Administrative Act of 1890 the function of the Secretary of the Treasury, in deciding disputes regarding the payment of duty at the administrative level, was transferred to nine general appraisers.[30] Although this act ended the availability of a trial by jury, the availability of a full trial before a court was maintained by a provision allowing the introduction of new evidence for use by a Circuit [District] Court in reviewing the questions of law *and fact* involved in the decision of the general appraisers.[31]

Thereafter, the general appraisers gradually took on the basic powers of a court so that when appeals to the Circuit Court were limited to the record of the Board of General Appraisers[32] and when the Court of Customs Appeals was created in 1909 and substituted as the exclusive appellate tribunal in customs lawsuits, the Board of General Appraisers occupied the position formerly held by the Circuit [District] Courts.[33] The same act that created the Court of Customs Appeals specifically gave the Board the powers of a Circuit [District] Court to conduct trials. Thus, the right to a complete trial of the relevant issues was maintained, albeit on the administrative level.

Although a jury trial was eliminated, the proceeding before the Board was a simulacrum of the proceeding formerly held in a Circuit [District] Court. In other words, although the trial of issues in a disputed exaction of duty was held at the administrative level, in scope the trial was never intended to be less than a continuation of the complete trial held at common law. Congress never went so far as to transform it into an action of lesser magnitude or a mere review of administrative actions or proceedings.

From this perspective, the later historical occurrences, the formal naming of this court in 1926,[34] the perfection of its independence in the Tariff Act of 1930,[35] its integration into the federal judicial system in 1948,[36] and the declaration of Congress in 1956 that it was a constitutional court, established under Article III of the Constitu-

---

**29.** Act of June 30, 1864, 13 Stat. 214:

An earlier 1857 law displayed a similar framework but not in connection with disputes as to the amount of duty and is therefore not regarded here as the origin of the administrative review prerequisite to the commencement of an action. See *Barney, Collector v. Watson et al.,* 92 U.S. 449, 23 L.Ed. 730 (1875).

**30.** Act of June 10, 1890 ch. 407, Sec. 12, 26 Stat. 131.

**31.** Id. Sec. 15.

**32.** Act of May 27, 1908, ch. 205, Sec. 2, 35 Stat. 403, 404.

**33.** Act of August 5, 1909, ch. 6, Sec. 29, 36 Stat. 11.

**34.** Act of May 28, 1926, ch. 411, 44 Stat. 660.

**35.** 47 Stat. 596–707.

**36.** Act of June 25, 1948, ch. 646, 62 Stat. 869, 899.

tion [37] all represent a single consistent line of development. The common purpose was to harmonize the court's forms and powers with the actions it tried.

The legislative history of the 1956 Act showed a clear recognition of the fundamental nature of the actions belonging within the subject matter jurisdiction of the Customs Court. The report of the House Committee on the Judiciary [38] stated in part as follows:

The Customs Court, and its predecessor, the United States Board of General Appraisers, has jurisdiction of a class of cases in law which arise under the Constitution, the laws of the United States, and the treaties made, or which shall be made, under their authority. *This subject matter has always been a type of case at law to which the judicial power extended by virtue of article III of the Constitution of the United States. The customs cases within the jurisdiction of the court have also been controversies to which the United States was a party and to which the judicial power attached.*

There has never been any revisory power in the executive or legislative branch of the Government over the judgment of the court or its predecessor, the Board of General Appraisers. The judgments of the court have always been final and conclusive and binding on all parties interested, including the United States and all of its officers.

Thus the committee is of the opinion that this legislation should be enacted to remove all doubt as to the status of the Customs Court as a court established under article III of the Constitution. [Emphasis supplied]

This short historical review shows that there has been a steady, continuous clarification by Congress of the position and power of this court. The action in this court, as it has emerged from its historical permutations, is still the statutory substitute for the common law action for recovery of duty. This court itself has emerged as the equivalent of the district courts in the trial of these matters.[39]

In the 1970 Act Congress further perfected this equivalence. The independent right of action emerged from the indistinct state in which it had existed for 80 years. The proceeding in this court is now called by its rightful name, a civil action. The action is now recognized as the latest embodiment of a proceeding which had a historical and legal existence antedating the administrative process. It is not subordinate to, or a further step in, the administrative process. It does not take its shape therefrom.

The only relationship between the two is one of procedural sequence and jurisdictional definition. The administrative process must be completed before the right of action in court can be asserted and only those matters which are protested on the administrative level can come within the subject matter jurisdiction of the court.

Thus, any claim that the trial of issues in this action is limited to a review of administrative investigations, or that the court's function is restricted to an evaluation of "administrative reasonableness" runs counter to the true historical nature of the action for the recovery of duties. Such a claim is inconsistent with a long line of manifest legislative intent that a forum be available for the complete trial of such cases, and that the forum be equipped with the powers necessary to insure a complete trial of all issues.

The restrictions advocated by defendant would also present serious constitutional problems. To the extent that the present

37. Act of July 14, 1956, ch. 589, 70 Stat. 532.

38. H.R.Rep.No.2348, 84th Cong., 2nd Sess. 2, *reprinted in* [1956] U.S.Code Cong. & Admin. News, Vol. 2, pp. 3122, 3123.

39. The exclusion of the subject matter jurisdiction of the Customs Court from that of the district courts in 28 U.S.C. § 1340 is a further reflection of this state of affairs:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage *except matters within the jurisdiction of the Customs Court.* [Emphasis supplied]

action is still a statutory substitute for an original common law action, a further alteration of the action to the point where a principle issue is finally determined only by means of an administrative investigation would destroy the last vestiges of a complete judicial hearing. Thus, the basic fairness of the substituted proceeding would be placed in question. See, *Anniston Mfg. Co. v. Davis, supra.* The Supreme Court has expressed its concern "that traditional forms of fair procedure not be restricted by implication or without the most explicit action by the Nation's lawmakers, even in areas where it is possible that the Constitution presents no inhibition." *Greene v. McElroy,* 360 U.S. 474, 496, 508, 79 S.Ct. 1400, 1419, 3 L.Ed.2d 1377 (1958).

 In addition, the proposed restrictions would raise the spectre of a deprivation of property without due process of law. Presently, this judicial forum is the guarantor of due process of law in the determination of disputes involving import duties. *Dart Export Corp. et al. v. United States,* 43 CCPA 64, C.A.D. 610 (1956). This availability of due process of law is required whether or not the importation of merchandise itself is characterized as a right or a privilege. *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Moreover, regardless, of whether there is a constitutional status to the right to import merchandise, those who engage in importation have a right to be free of illegal and excessive exactions of duty. Elementary fairness requires the same or equivalent process of law for relief from illegal and excessive exactions of duty as for illegal and excessive assessments of taxes in the domestic sphere. See, 26 U.S.C. § 7422 in conjunction with 28 U.S.C. § 1346. See also, 26 U.S.C. § 6213.

In sum, the restrictions advocated by defendant, contradict the plain meaning of the relevant statutes, are inconsistent with case law and the history of the action and pose serious constitutional problems.

## IV. *The Scope of Trial of Other Issues*

Defendant's argument for a limitation on the scope of trial of the issue of the existence of a bounty or grant also relies upon limitations expressed with regard to other issues arising in actions in this court. Specifically, defendant refers to cases involving the correctness of tariff treatment under the flexible tariff provisions of Section 336 of the Tariff Act of 1930 and the Anti-Dumping Act of 1921.

Both of these tariff statutes have a certain structural resemblance to the assessment of countervailing duty. Generally speaking, the assessment of these duties is made pursuant to an administrative determination which follows other statutorily required administrative investigations into underlying conditions. Under the flexible tariff provisions the proclamation by the President of a change in duty is preceded by a report of the International Trade Commission. This report considers whether the existing tariff rate fails to cure an imbalance between the costs of production of domestic and foreign products and recommends a modification necessary to remedy this condition. In the case of anti-dumping duties, the assessment of duty is made following a determination by the Secretary of the Treasury that certain merchandise is being sold at less than fair value and a determination by the International Trade Commission that an American industry is being injured thereby. (Both determinations were formerly made by the Secretary of the Treasury.)

Careful study of the decisions expressing or perpetuating the concept of a limitation on the scope of trial of certain issues reveals to the court that the reasons offered for the limitations are either entirely distinguishable, incapable of exact determination, or so rooted in outdated procedures and particular historical antecedents that they are no longer consistent with present circumstances.

### A. *Flexible Tariff*

The rationale offered for a limited scope of trial in actions contesting duty assessments under the flexible tariff statutes was based on statutory interpretation. In hold-

ing that the Customs Court may not judge the correctness of the Tariff [Trade] Commission's use of a particular period of time for the ascertainment of the value of the Japanese yen (for the purpose of determining the Japanese cost of production) the Supreme Court in *United States v. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940) stressed the discretionary nature of the subsequent presidential decision to proclaim a rate modification. It found the legislative grant of this discretion in the statutory use of the words "if, in his judgment". In the view of the *Bush* decision this indicated an intention to make the President's judgment and the underlying facts immune from judicial scrutiny.

■ The existence of presidential discretion in proclaiming a tariff modification distinguishes the flexible tariff from the countervailing duty. In countervailing duty the Secretary of the Treasury has no discretion in ordering the assessment of additional duties. *American Express, Co. v. United States,* 60 CCPA 86, 93, 472 F.2d 1050 (1973).

It should be carefully noted that the freedom of the Secretary of the Treasury to decide *how to investigate the existence of* the bounty or grant is not the sort of discretion on which the Supreme Court relied. The Supreme Court found discretion in making the *ultimate* decision, not discretion in how to conduct a preliminary investigation.[40]

Therefore, the presidential discretion in flexible tariff matters is distinguishable from the power of the Secretary of the Treasury in countervailing duty matters.

In addition, further study of the presidential "discretion" calls into question whether it is indeed a legislative expression of the insulation of the underlying facts from judicial scrutiny. When the flexible tariff

provision of § 315 of Title III of the Tariff Act of 1922[41] was first challenged as an unconstitutional delegation of legislative power to the President it was upheld by the Supreme Court on the grounds that "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Hampton & Co. v. United States,* 276 U.S. 394 at 409, 48 S.Ct. 348 at 352, 72 L.Ed. 624.

The Supreme Court followed with an approving repetition of the reasoning used forty years earlier to uphold the constitutionality of legislation granting the President power to suspend the free importation of certain articles. The court stated as follows: (p. 410, 48 S.Ct. p. 352.)

[N]othing involving the expediency or just operation of such legislation was left to the determination of the President; that the legislative power was exercised when Congress declared that the suspension should take effect upon a *named contingency.* What the President was required to do was merely in execution of the act of Congress. It was not the making of law. *He was the mere agent of the lawmaking department to ascertain and declare the event upon which its expressed will was to take effect."* [Emphasis supplied]

It therefore seems that *lack* of discretion in its application saved the flexible tariff from unconstitutionality, while the *existence* of discretion in its application insulated the substance of the flexible tariff determination from judicial scrutiny. A possible reconciliation of this apparent contradiction is to consider the *Bush* decision as actually focusing on the power of the President to select a new rate. The calculation of the

---

**40.** If the sort of thing the Secretary of the Treasury does in deciding how to go about investigating the existence of a bounty or grant *is considered discretionary in the full sense,* then practically everything done in customs administration can be considered discretionary and the facts underlying any administrative de-

cision will be insulated from judicial scrutiny. The trial of even basic classification and valuation actions in this court could thereby be thrown into disarray.

**41.** Act of Sept. 21, 1922, ch. 356, 42 Stat. 858, 941.

change in rate needed to equalize differences in the domestic and foreign costs of production would be the judgment which the *Bush* decision saw as discretionary and immune from judicial probing. But the underlying determination that the condition exists which requires the proclamation of a new rate, (i. e., the *existence* of a difference between the foreign and domestic costs of production which is not equalized by the statutory duties) is the "named contingency" or the declared "event" or the "intelligible principle" to which the act of the President must conform. Thus, the phrase "in his judgment" refers to the judgment by the President that the proposed rate changes will equalize the differences in costs of production, not to a judgment he makes that the differences exist.

This court should, under this analysis, judge whether the contingency named in the statute had occurred. This court would not be doing so as a form of review over the Trade Commission or the Presidential decision but in the exercise of its judicial powers to judge a fundamental issue in a lawsuit challenging the ultimate imposition of duty. The fundamental issue would be whether the conditions described in the statute as a necessary basis for the change of tariff rate did, or did not, exist.

In this respect the court's function would be the same as it is in a countervailing duty case or in any other case in which it is judging an issue of conformity to a statutory standard. Did an inequality in costs of production exist? Did a bounty or grant exist? Did an export value exist? Did a chief use exist? The development of distinctions between the trial of these issues is artificial and inconsistent with the statutory scheme now in effect. It is also inimical to the existence of a clear and uniform system of justice in tariff disputes.

It may be observed in passing that even this reconciliation of the *Hampton* case and the *Bush* case does not fully resolve the problems posed by the latter case. The only complete answer may be that the measure of discretion discerned in *Bush* was sufficient to preclude judicial scrutiny only in light of the formerly indistinct legislative expression of the judicial power in that area. Important changes have since taken place, among which are the Congressional clarification of the status of this court and the recognition of the independent and distinct nature of the actions over which it has jurisdiction.

■ A consistent and uniform standard of justice now requires that no issue arising within the subject matter jurisdiction of this court be insulated from complete examination and determination without the most explicit direction by Congress. If the issue is the conformity of the administrative action to an intelligible principle expressed by Congress it is for this court to decide it. Absent an explicit restriction on the court it does not matter what official or body took the disputed action or with what putative discretion it was taken.

■ In the area of judicial review pursuant to the Administrative Procedure Act, the Supreme Court has characterized nonreviewability of administrative action as "an exception which must be demonstrated." *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1969). See also, *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1966). It follows that when Congress has provided a specific and independent action to obtain relief from administrative aggrievement and has provided a specialized and exclusive judicial forum, a constraint on the trial of a particular issue must be demonstrated with the utmost specificity.

For these reasons the court would conclude that there are no longer any grounds to perpetuate or expand past restraints on this court on the subject of flexible tariffs, or to limit this court's scrutiny of any issue relevant to the decision of an action within its subject matter jurisdiction.

In addition to its distillation as a product of discretion in *United States v. Bush & Co., supra,* the flexible tariff restriction on this court's scope of trial can be followed back in time as well through *United States v. S. Leon & Co.,* 20 CCPA 49, T.D. 45677 (1932)

and *United States v. Sears, Roebuck & Co.,* 20 CCPA 295, T.D. 46086 (1932) to its origin in cases seeking to challenge the value of foreign money as ascertained by the director of the mint and proclaimed by the Secretary of the Treasury (*United States v. Klingenberg,* 153 U.S. 93, 14 S.Ct. 790, 38 L.Ed. 647 *infra*) and, even beyond, to cases seeking to challenge the determination by the Secretary of War that certain bridges were an unreasonable obstruction of free navigation. *Monongahela Bridge Co. v. United States,* 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435 (1910).

These cases are also relied upon in decisions expressing a restriction on this court's scope of trial in anti-dumping duty cases and will be more thoroughly discussed in the next section of this opinion. For the moment, however, it suffices to say that a study of these decisions reveals them to be of questionable relevance today.

### B. *Dumping Duty*

In addition to its reliance on restrictions expressed in flexible tariff cases, defendant relies on restrictions expressed in cases involving anti-dumping duty. As mentioned, the assessment of anti-dumping duty is preceded by a dual determination; sales of the importation at less than fair value and resulting injury to a domestic industry. Restrictions on the court's power to judge the facts of the matter, that is to say, whether sales at less than fair value and injury existed have indeed been expressed and followed. Most recently the restrictions have been expressed in the form of discovery orders which apparently indicate that the object of the discovery is to enable this court to review the record of the International Trade Commission's injury finding and to decide whether the finding was "among other things, arbitrary, an abuse of discretion or otherwise contrary to law." *Pasco Terminals, Inc. v. United States,* 81 Cust.Ct. C.R.D. 78–3 (1978). This reflects a line of decision going back, without clarification, through *Imbert Imports, Inc. v. United States,* 60 CCPA 123, C.A.D. 1094, 475 F.2d 1189 (1973) and *City Lumber Co. v.*

*United States,* 59 CCPA 89, 457 F.2d 991, C.A.D. 1045 (1972) to *Kleberg & Co. v. United States,* 21 CCPA 110, T.D. 46446 (1933). The oft-quoted language of the *Kleberg* decision reads as follows:

It is equally well established by the authorities that if the Secretary of the Treasury has proceeded in the method prescribed by the Congress, we may not judicially inquire into the correctness of his conclusions. The constitutionality of the law under which he proceeds having been once determined, then the judicial power extends only to a correction of his failure to proceed according to and within the law. *United States v. Sears, Roebuck & Co. supra; Clarke v. United States,* 17 C.C.P.A. (Customs) 420, T.D. 43866; *United States v. Tower & Sons,* 14 Ct.Cust. Appls. 421, T.D. 42058; *United States v. Central Vermont Railway Co.,* 17 C.C.P.A. (Customs) 166, T.D. 43474.

This being the state of the law, we are not at liberty here to go into an investigation as to whether the facts shown on the trial below justified the issuance of the order complained of. Under the statute, the Secretary was not confined to any particular source of information or means of investigation. Furthermore, such information as he might obtain was not open to public inspection, unless he felt that the public interest so required. *Norwegian Nitrogen Products Co. v. United States,* 20 C.C.P.A. (Customs) 27, T.D. 45674, affirmed in 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796.

The above quotation will be referred to as the *Kleberg* restriction. The cases cited in its support show that it has four roots. The first is in flexible tariff cases. The second is in foreign currency value cases. The third is in directed assessment cases and the fourth is in cases dealing with the power of the Board of General Appraisers in reappraisement matters.

In the sources of its reasoning and in its assumptions, the *Kleberg* restriction represents a concept of judicial power and authority which is no longer an accurate reflection of Congressional intent.

The *Kleberg* restriction depends upon an acceptance of the premises that the raising, in this court, of an issue regarding the existence of injury, or sales at less than fair value, implies a review of a particular administrative proceeding. But, as was pointed out earlier in this opinion, when a party contests an assessment of duty and raises the above issues in the Customs Court it does so, not by virtue of a right to judicial review of any particular underlying administrative proceeding, but as the consequence of the right to bring an independent civil action for the recovery of duty. The party therefore has a right to have all the issues in that action tried on the record made before the court. Included in the issues may be the question of whether the conditions named in the statute as prerequisites to the assessment of duty existed or did not exist. The power of an administrative agency to decide that question for itself is not a bar to the determination of that same question by the court, unless the power of the court to decide issues in a civil action is somehow expressly limited. The continued viability of the *Kleberg* restriction must be questioned in light of the present statutory framework for the trial of issues in independent civil actions. The present statutory arrangement displays no restrictiveness and does not permit the inferences which might have been drawn from the statutory scheme in effect when the cases on which the *Kleberg* restriction is based were decided. We now turn to an examination of those cases.

### 1. *Flexible Tariff Root*

As noted earlier, the flexible tariff issue restriction was crystallized in the *Bush* opinion as being a matter of statutory interpretation. The statute revealed in its language a grant of "discretion" to the President to make a judgment of what new rate of duty would correct a disparity between the costs of production of domestic and foreign articles (when the disparity was not equalized by the existing rate of duty.) In this light the anti-dumping statute is not comparable. In none of its forms [42] did the Anti-Dumping Act grant discretion in the complete sense in which it was found in *Bush*. Accordingly, insofar as the *Kleberg* restriction relies on the flexible tariff restriction, it is subject to the same distinctions and disabilities previously discussed.

### 2. *The Foreign Currency Root*

The flexible tariff issue limitation joins the second root of the *Kleberg* restriction, which is the conclusiveness of the Secretary of the Treasury's proclamation of the value of foreign currency [foreign "coin"] as estimated by the Director of the Mint. Thus, we move from the "discretion" of an administrative action to its legislatively-intended conclusiveness as the basis of a restriction on the court.

In *Cramer v. Arthur*, 102 U.S. 612, 26 L.Ed. 259 (1881) a suit was brought against the Collector of Customs at the Port of New York alleging that the Collector had overestimated the value of the invoice currency (the Austrian florin) when computing the value of the importation in United States money, and had therefore taken an excessive amount of duty. The Supreme Court held that the plaintiff could not attack the currency exchange calculation of the Collector because it was done pursuant to a proclamation of the value of foreign coin made by the Secretary of the Treasury in accordance with a statute which provided that the value of standard foreign coins should be estimated once a year by the Director of the Mint and proclaimed on the first of January by the Secretary of the Treasury. The Supreme Court explained that this procedure had replaced prior Acts in which Congress itself had set the rate of exchange. It characterized the valuation as binding on the Collector and on importers

---

42. At one time the Secretary of the Treasury determined both whether imported merchandise was sold at less than fair value *and* whether a United States industry was being injured as a consequence.

Act of May 27, 1921, ch. 14, Title II, § 201, 42 Stat. 11.

". . . just as binding as if it had been a permanent statute. . . ." (p. 616) It saw utter confusion and uncertainty resulting if every importer could raise the question of the value of foreign money on every invoice.

In a similar situation involving the value of the Mexican dollar in *Hadden v. Merrit*, 115 U.S. 25, 5 S.Ct. 1169, 29 L.Ed. 333 (1885) the Supreme Court elaborated on the earlier discussion. It found that Congress intended an annual settlement of currency values. It characterized the ascertainment and declaration of currency value as ". . . the performance of an executive function, requiring skill, and the exercise of judgment and discretion, which precludes judicial inquiry into the correctness of the decision." (p. 27, 5 S.Ct. p. 1170.)

Finally, in *United States v. Klingenberg*, 153 U.S. 93, 14 S.Ct. 790, 38 L.Ed. 647 (1894) the same issue was discussed in terms of the recently created Board of General Appraisers, i. e., that the collector's action in adopting the value of the gold florin proclaimed by the Secretary of the Treasury was conclusive and therefore was not subject to examination by the Board of General Appraisers.

The foreign currency proclamation can be distinguished on numerous grounds from the underlying investigations in anti-dumping or countervailing duty matters. It was a direct replacement for a specific Congressional proclamation of the rate; it was done only once a year (or quarterly in later years); it was a general determination, unrelated to specific merchandise or specific importations of merchandise; it was certainly not done as part of a process of determining additional duties; and it was based on an estimate.

But the most important distinguishing characteristic of the foreign currency proclamation restriction was the less developed structure of the judicial "review" of the time. The decision in *Klingenberg* sets out the scope of the proceeding before the Board of General Appraisers during that period. Section 14 of the Customs Administrative Act of June 10, 1890, provided that the *decision of the collector* as to the rate and amount of duties would be final and conclusive unless a written objection was made to the collector, whereupon the matter was forwarded to be examined by the board of three general appraisers and decided by a majority of them. An appeal was available to the circuit court (the district court of the time) and a provision existed for the taking of additional evidence for the benefit of the circuit court.

The 1890 act did not contain the language of Section 514 of the Tariff Act of 1922 which added the "legality of all orders and findings entering into the same" to the description of what administrative matters were subject to written objection. Thus, the foreign currency restriction, aside from its other distinguishing characteristics, was developed in the absence of a statutory expression of the totality of the decisions which were being subjected to objection and, by extension, to the scrutiny of the courts. It developed in the absence of a Federal court with exclusive jurisdiction in customs matters and at a time when distinctions between acts of the Collector of Customs and acts of the Secretary of the Treasury were considered germane.[43]

In these respects continued reliance on the *Kleberg* restriction, insofar as it is an embodiment of the foreign currency restriction, should be questioned. In its origin it was a reflection of a statutory structure which has since been substantially modified. See generally, *Argosy Limited v. Hennigan*, 404 F.2d 14 (CA 5th 1968), in which the following perceptive comment is made at page 20:

. . . [T]he jurisdiction of the Customs Court is today considerably more comprehensive than was the jurisdiction of its predecessor, the United States

---

**43.** It should also be noted that the office of the Collector of Customs was abolished and its functions transferred to the Secretary of the Treasury in 1965. Reorganization Plan No. 1 of 1965, 30 Fed.Reg. 7035, 79 Stat. 1317, pursuant to Reorganization Act of 1949, 63 Stat. 203, as amended.

Board of General Appraisers, in 1892. Its jurisdiction not only is exclusive of other courts, but over the years has grown more inclusive whenever matters pertaining to the customs laws have been concerned. [Footnote and citations omitted]

### 3. *Directed Assessment Root*

The third root of the *Kleberg* restriction passes through another anti-dumping case (*United States v. Tower & Sons*, 14 Ct.Cust. Appls. 421, 427 T.D. 42058 (1927), to cases in which importers sought to contest the failure of the Secretary of the Treasury to direct a lower assessment under paragraph I of Section 3 of the Tariff Act of 1921. Under that paragraph the collector was forbidden to assess duty on less than the entered value unless he was directed to do so by the Secretary of the Treasury. The Secretary of the Treasury was empowered to direct such assessments in cases where the importer had won a related valuation dispute and had only raised the entered value (now sought to be lowered) in a good faith attempt to conform to the requirements of the appraiser in the related dispute. In such cases it was held that the Secretary of the Treasury's judgment as to whether the facts merited a directed assessment was not reviewable by any judicial tribunal. The reason given was that the Secretary of the Treasury "was vested by Congress with *exclusive* authority to direct that an assessment of duties be made upon an amount less than the entered value . . ." and that he was the "tribunal of last resort." [Emphasis in original] *Kurz & Co. v. United States*, 13 Ct.Cust.Appls. 527, 530 T.D. 41395 (1926).

The point was made even more explicitly in the earlier case of *Mills & Gibb v. United States*, 8 Ct.Cust.Appls. 31, T.D. 37153 (1917), when the court stated at page 38:

* * * [T]he authority granted to the Secretary by the paragraph in question is distinctly denied to the Collector. That officer is neither empowered nor permitted to examine or decide as to the facts upon which the relief of the importers is made to depend . . . [I]t should be remembered in this connection that *it is the action or decision of the collector which may be challenged by protest*, and that this makes up the issue which goes to the board for decision, and which may be appealed to this court.

What we see here then is the insulation of a decision of the Secretary of the Treasury from judicial review based on a narrow and technical limitation of the right of protest to acts or decisions which were *exclusively* those of the collector. The basis for this restrictive view was removed in the Tariff Act of 1922 which, in its expression of what could be protested (Section 514) added to the previous bare mention of the "decision[s] of the collector . . . as to the rate and amount of duties . . ." the language "*including the legality of all orders and findings entering into the same.*" [Emphasis supplied]

In an important comment, the Report of the Committee on Ways and Means stated that "The jurisdiction of the Board of General Appraisers . . . is somewhat enlarged by allowing the review of questions which are now exclusively decided by the Secretary of the Treasury." [44]

It is clear therefore that the language "all orders and findings", which continues in the present 19 U.S.C. § 1514, is a reminder of the withering of the third root of the *Kleberg* restriction; and an indication of the enduring Congressional intention that the entire fabric of the duty determination is to be subject to judicial scrutiny. [45]

---

44. Report of the Committee on Ways and Means to accompany H.R. 7456, 67th Congress, 1st Sess., H.Report No. 248, page 26.

45. The devastating dissent of Judge De Vries in *Mill & Gibb v. United States*, contains, at page 51, a notable statement of basic principles.

"The grant of power in the board upon protest to determine the correct amount of duties upon importation *is without limitation*. The act nowhere says that when an illegal amount levied is due to the Secretary's mandate, or any other excepting cause, the board is without jurisdiction, but the grant of power in the board is unlimited, *whatever the cause or whoever causes an illegal amount of duties to be levied*.

4. *The Board of General Appraisers Root*

The fourth root of the *Kleberg* restriction, if it does anything, tends to support the conclusion that the exercise of power by the Secretary of the Treasury under the Anti-Dumping Act is properly subject to judicial scrutiny. In *United States v. Central Vermont Railway Co.*, 17 CCPA 166, T.D. 43474 (1929) the powers conferred on the Secretary were referred to as "ministerial only" (p. 174) and as calling for the exercise of "no discretion except in methods, and are fact finding only." The court concluded that the legality of the dumping order could be litigated in a reappraisement proceeding. The issue in that case was simply whether the dumping order could be signed by an Assistant Secretary but the reasoning of the decision was that "any question affecting the appraisement, either as to its amount or legality, is properly before the Customs Court on review." (page 175)

The search for a clear principle of broad application or lasting validity, at the core of the *Kleberg* restriction, ends without success. In fact, the impression grows that the restriction is honored more from lack of detailed examination than from its enduring validity. It now seems that the more basic, and dominant principle at work in both the historical and recent past of this court is a tendency towards completeness and uniformity of the system of justice in customs matters. At the very least, restricting conceptions which may have been carried forward unquestioningly need to be reexamined thoroughly to consider their validity in light of the present state of the law.

 This court either has jurisdiction of an action or it does not. When it does have jurisdiction the statutory scheme clearly provides for the trial of all relevant issues without distinction between them. The issue of whether basic statutory guiding principles have been properly followed or applied is of fundamental relevance to any action and uniquely within the traditional competence of the courts to decide. This issue may arise in any action within the subject matter jurisdiction of this Court and, when it does, it should be fully tried unless there is a specific statutory limitation to the contrary.

V. *The Suwannee Steamship Cases*

Defendant has also cited the cases of *Suwannee Steamship v. United States*, 70 Cust.Ct. 327, C.R.D. 73–3 (1973) and *Same v. Same*, 79 Cust.Ct. C.D. 4708, 435 F.Supp. 389 (1977), as representing the application of principles of relatively narrow judicial review of administrative actions to issues in this court. In *Suwannee I* the court decided that it had subject matter jurisdiction of an action brought to challenge the refusal of the Secretary of the Treasury to remit duties on ship repairs.[46] In *Suwannee II* it decided the action based on a standard of whether the Secretary of the Treasury's interpretation of the statutory standards governing the remission was "in accordance with the law" and whether his findings as to the underlying facts were unreasonable, arbitrary, capricious, or an abuse of discretion.

In the view of this opinion the reliance in *Suwannee I* and *II* on principles of general administrative law as the basis of subject matter jurisdiction was misplaced.

In *Suwannee I* the obstacle to jurisdiction was mistakenly perceived as being the discretionary nature of the decision to remit the duties. The actual statutory language stated that if the owner or master of the vessel furnished "good and sufficient evidence" that the repairs were compelled by

---

"Upon due protest, challenging the amount of duty levied, the determination of the legal duty carries with it *the power of inquiry and decision by the board as to all legal performances the result of which entered into and affected the amount of duties levied* and covered by the protest." [First emphasis in original; remainder supplied.]

**46.** Act of August 8, 1953, ch. 397, § 11(c), 67 Stat. 515 (current version at 19 U.S.C. § 1466 (1971).

"stress or weather or other casualty" then the Secretary of the Treasury was "authorized" to remit or refund the duties.

This provision for the benefit of vessels forced to make emergency repairs outside the United States was not a grant of discretion to the Secretary of the Treasury.[47] In reality, the obstacle to jurisdiction had nothing to do with discretion. It was the immunity of the Secretary of the Treasury's decision from protest under the statutes which had previously insulated the remission issue from determination by the court. *Waterman Steamship Corp. v. United States*, 30 CCPA 119, 125, C.A.D. 223 (1942). That immunity came about from a holding that the collectors of customs did not have the power to review issues "the final determination of which was conferred by the Congress exclusively upon the Secretary of the Treasury." *Waterman Steamship Corp. v. United States, supra*, p. 125. Since the Secretary of the Treasury's decision could not be examined in an administrative protest review it followed that it could not be within the subject matter jurisdiction of a court limited to subject matters which could be protested. This reasoning was similar to the outmoded analysis contained in the directed assessment cases such as *Mill & Gibbs, supra*, and, in fact, *Mill & Gibbs* was one of the cases on which *Waterman* relied.

In *Suwannee I* the supposed obstacle of discretion was overcome by the resort to principles of judicial review of agency action in general and discretionary action in particular. The result was an apparent expansion of jurisdiction but at the expense of a complete scope of review and at the even greater cost of fostering a misconception

that the court functioned in a framework of conventional administrative law.

In reality, the source of this court's subject matter jurisdiction in the case of duty assessments is not a general supervisory role which it plays in customs matters under general principles of judicial review of administrative action. The subject matter originates from a fixed range of acts and subjects named in 19 U.S.C. § 1514. Since the artificial distinction between acts of the Secretary of the Treasury and acts of his subordinates no longer exists in matters of duty imposition, the obstacle perceived in the *Waterman* case no longer exists.

The remission of ship repair duties is a matter whose finality is made subject to a process of administrative review by 19 U.S.C. § 1514. It would be subject to complete examination in the subsequent trial of an action brought in this court to contest the failure to provide relief in that administrative process. If the refusal to remit duties was not protestable under § 1514 then no extraneous considerations such as the Administrative Procedure Act, or general rules of judicial review, could mold it into a form that could be protested. The court would simply not have subject matter jurisdiction.

Section 1514 is the filter through which a dispute challenging an assessment of duty must pass. This filter does not expand or contract in accordance with general principles of administrative law. It simply defines the *subject matter* jurisdiction of the court. Thus, under this analysis the matter of remission would fall within the jurisdiction of the court as the decision of the appropriate customs officer as to the amount of duties chargeable or as an order

**47.** The proper approach to statutory provisions such as this, was stated by the Supreme Court in *Supervisors Rock Island Co. v. United States ex rel. State Bank*, 71 U.S. (4 Wall) 435, 446, 447, 18 L.Ed. 419 (1867).

The conclusion to be deduced from the authorities is, that where power is given to public officers, in the language of the act before us, or in equivalent language—whenever the public interest or individual rights call for its exercise—the language used, though permissive in form, is in fact peremptory. What they are

empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depositary to meet the demands of right and to prevent a failure of justice. It is given as a remedy to those entitled to invoke its aid, and who would otherwise be remediless.

In all such cases it is held that the intent of the legislature, which is the test, was not to devolve a mere discretion, but to impose "a positive and absolute duty."

or finding entering into the decision of the appropriate customs officer.

Once through the filter of § 1514, there are no limitations on the depth with which a particular issue may be explored so the standard of decision to be applied to the issue of remission, if it reached the court, would be whether or not the law and the facts required the remission.

At that stage the "discretion" of the Secretary of the Treasury which concerned the court in *Suwannee I* would be no greater a bar to the scrutiny of the court than the "discretion" of the appropriate customs official in choosing a classification or a valuation. Whatever implications might flow from the exercise of administrative authority are superseded by the specific subjection of the issues ultimately raised to determination in an independent court action.

█ In sum, the *Suwannee* cases asserted subject matter jurisdiction on a broad premise of administrative law which carried with it a narrow scope of review. Jurisdiction in this court must be premised on its own particular and explicit statutory authority. However, once a matter falls within the statutory authority it is tried in an entirely unrestricted manner. It logically follows that when the issue of the existence of a bounty or grant arises in an action challenging the imposition of countervailing duty all related questions of fact and law are subject to judicial scrutiny.

## VI. *The Judicial Nature of the Issue*

Defendant also attempts to characterize a determination of the existence of a bounty or grant as an issue involving the exercise of judgment in the area of foreign trade policy. Defendant quotes the remark in *United States v. Hammond Lead Products, Inc.*, 58 CCPA 129, C.A.D. 1017, 440 F.2d 1024 (1971) cert. den. 404 U.S. 1005, 92 S.Ct.

565, 30 L.Ed.2d 558 (1971) that such a determination "necessarily involves judgments in the political, legislative, or policy spheres." However, that remark was made in support of a conclusion that there was no judicial "review" of determinations by the Secretary of the Treasury that *no* bounty or grant was being bestowed. The above conclusion prompted Congress to provide an action to contest that "negative" determination. See, 28 U.S.C. § 2632(a)(3).[48] See also, Senate Finance Committee report (S.Rep.No.92–1221, 92d Cong., 2d Sess. 8 (1972). In so doing, Congress implicitly expressed the view that the *final* determination of the existence or nonexistence of a bounty or grant was wholly a judicial matter.

This court rejects any suggestion that the final judgments required in such a matter are other than judicial or that some sort of judicial abstention is appropriate. The proposition is insupportable and inconsistent with the countervailing duty statute, which expresses a fixed legislative standard for the assessment of the additional duties. For this court, the judicial function in the determination of whether a bounty or grant has been bestowed is the same as that required in the determination of any other statutory condition or term, such as "export value" or "chief use."

If there are fine points of economics involved in the ascertainment of the facts of a particular financial arrangement, then the matter is tried in the same manner as cases involving fine points of any area of specialized knowledge. The parties to the dispute before the court may support their contentions with appropriate evidence including expert opinion and authority.

This court's "expertise" in questions of classification or valuation (fields in which

---

**48.** Act of January 3, 1975, P.L. 93–618, Title III, Chap. 2, § 321(f)(3), 88 Stat. 2048.

The nature of the civil action to contest the determination by the Secretary of the Treasury that a bounty or grant is *not* being bestowed, must be discussed, lest by its closer superficial resemblence to a direct review of an administrative proceeding, its trial be mistakenly con-

sidered narrower than the trial of this civil action under § 2632(a). It suffices to point out that this was also made a "civil action" to "contest" and the legislative history makes it clear that it was intended as a replica of the action already provided for the benefit of the importer.

defendant apparently has no qualms as to the completeness of the court's scrutiny) is not derived from specialized knowledge of particular subjects such as engineering or chemistry or medicine. Its expertise is in the interpretation and application of the statutory and legal principles of customs law. This is precisely what is involved in the question of the existence of a bounty or grant, no more and no less. Moreover, since the determination of the existence of a bounty or grant may very well involve the interpretation of foreign law, this would be a matter particularly within the competence of courts as well.

Judicial decisions interpreting and applying legislative language may have implications in many other spheres. This is a normal consequence of judicial decisions in any matter. However, the consequences of a court decision should not be confused with the judicial method of reaching a decision. The determination of the issue of existence of a bounty or grant within the meaning of the statute has always been reached by accepted and traditional judicial methods. For the court to utilize standards of judgment from any sphere other than those normally applied in judicial proceedings, would be unnecessary and improper.

Defendants additional argument that the administrative investigation is rendered useless if this court can try all issues of fact is ingenuous. It is obvious that administrative finality and efficiency must yield to more basic considerations of legality and conformity to principles established by Congress.

## VII. Summary

Defendant's insistence on a restricted scope of trial in this countervailing duty action is without support. An unrestricted trial of all issues of fact and law is mandated by the plain legislative intent of the relevant statutes and is supported by the relevant case law. In addition, an unrestricted trial is the only proceeding consistent with the recent as well as remote history of the action, and is the only guarantee of the protection of constitutional rights in the area of tariff disputes.

The existence of a distinct and exclusive statutory action provided for by Congress precludes the application of general principles of judicial review of administrative actions. The action is brought to obtain the relief denied on the administrative level and requires the determination of all relevant issues in the court proceeding.

Restrictions expressed with regard to the court's power to try other issues have been found to be of questionable validity in light of the controlling considerations governing actions in this court and, in any event, are without application to the action involved herein.

The distortion of the motion for summary judgment, brought about by the intensive emphasis on the asserted restrictions on the court's power to try all the issues, requires that it be denied.

## VIII. The Further Conduct of This Action

The implications of this opinion for the further conduct of this action are as follows:

The parties may utilize all relevant evidence regarding the issue of the existence of a bounty or grant without regard to whether or not the evidence was part of the administrative investigation.

The absence or presence of due process of law at the administrative level has no bearing on this action since the court is not judging the investigative proceeding or the resulting order but is itself trying the issue of the existence of a bounty or grant in an independent action. This court proceeding satisfies the requirements of due process of law in this area. On the administrative level, conformity to the administrative procedure set out in the statute is sufficient to satisfy the requirements of the law.

The claim by plaintiff that the assessment of duty was improperly influenced remains relevant since proof of such improper influence would be proof that the

assessment was predicated on, or tainted by, considerations not named in the statute or permitted by law. This would be relevant to judging the correctness of the assessment of countervailing duty which is, of course, the principal issue in the case.

For the reasons expressed herein, defendant's motion for summary judgment is denied.